UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | |
|---|---|
| OGLALA SIOUX TRIBE, A FEDERALLY RECOGNIZED INDIAN TRIBE; | 5:22-CV-05066-RAL |
| Plaintiff, | |
| vs. | |
| UNITED STATES OF AMERICA, DEB HAALAND, IN HER OFFICIAL CAPACITY AS SECRETARY OF THE UNITED STATES DEPARTMENT OF INTERIOR;   UNITED STATES BUREAU OF INDIAN AFFAIRS, STEVE JUNEAU, IN HIS OFFICIAL CAPACITY AS ACTING DIRECTOR OFFICE OF JUSTICE SERVICES OF THE UNITED STATES DEPARTMENT OF THE INTERIOR; JOHN BURGE, IN HIS OFFICIAL CAPACITY AS SPECIAL AGENT IN CHARGE OF DISTRICT 1 OF THE UNITED STATES OFFICE OF JUSTICE SERVICES OF THE UNITED STATES DEPARTMENT OF THE INTERIOR; TINO LOPEZ, IN HIS OFFICIAL CAPACITY AS ACTING APPROVING OFFICIAL FOR THE OFFICE OF JUSTICE SERVICES OF THE UNITED STATES DEPARTMENT OF THE INTERIOR; DARRYL LACOUNTE, IN HIS OFFICIAL CAPACITY AS COMMISSIONER, BUREAU OF INDIAN AFFAIRS, UNITED STATES DEPARTMENT OF THE INTERIOR; GINA DOUVILLE, IN HER OFFICIAL CAPACITY AS SUPERINTENDENT OF INDIAN AFFAIRS OF THE UNITED STATES BUREAU OF INDIAN AFFAIRS OF THE UNITED STATES DEPARTMENT OF THE INTERIOR; AND GLEN MELVILLE, IN HIS OFFICIAL CAPACITY AS DIRECTOR, OFFICE OF JUSTICE SERVICES OF THE | OPINION AND ORDER DENYING DEFENDANTS' MOTION TO DISMISS AND RULING UPON PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION |

1

UNITED STATES DEPARTMENT OF THE
INTERIOR, BUREAU OF INDIAN AFFAIRS;

Defendants.

Plaintiff the Oglala Sioux Tribe ("The Tribe") is a federally recognized Indian tribe and a subtribe of the native people colloquially known to English speakers as "The Great Sioux Nation."[1] The Tribe has roughly 51,000 enrolled tribal members and is headquartered on the Pine Ridge Indian Reservation ("the Reservation"), which encompasses approximately 3.1 million acres in southwestern South Dakota. The Tribe is a signatory and party to several treaties with the United

---

[1] Historically, the United States government has used the word "Sioux," a French transcription of an Ojibwe term, as an exonym to collectively describe the native people of the upper Midwest and northern Great Plains who share the Daḳota language. Akim D. Reinhardt, Welcome to the Oglala Nation 1 (2015). For the sake of providing some context, albeit with a risk of continuing the unfortunate trend of oversimplifying native history, the native people who speak two mutually intelligible dialects of Daḳota—Daḳota proper and Laḳota—are told to have once been bound together through an alliance known as the Očeti Šakówiŋ (Seven Council Fires). See id.; Oceti Sakowin, Akta Lakota Museum & Cultural Ctr., https://aktalakota.stjo.org/oceti-sakowin-seven-council-fires/ (last visited May 15, 2023). Subdivisions known as the Isaŋti (Santee), Ihaŋktonwaŋ (Yankton), and Tituwaŋ (Teton) kept the council fires; of the seven fires, four are said to have been kept by the Isaŋti, two by the Ihaŋktonwaŋ, and one by the Tituwaŋ. Reinhardt, supra note 1, at 1. South Dakota's nine Indian reservations are home to native people from many of these bands, and they continue to share kinship, dialect, and geographic proximity to this day. Oceti Sakowin, supra note 1. The Tituwaŋ are further divided into seven sub-tribes, the largest of which is the Oglalas (They Scatter Their Own). Reinhardt, supra note 1, at 2; Oceti Sakowin, supra note 1. The Tituwaŋ, including the Oglalas, are often known as Laḳotas and speak the Laḳota dialect. The term "Sioux" is used occasionally throughout this opinion and order only because that is how treaties, federal statutes, and commentators refer to the native people with whom the Oglalas share not only historical ties, but certain legal entitlements under the treaties the federal government made with the "Sioux." See generally Reinhardt, supra note 1, at xix–4 (2015); Loretta Fowler, The Columbia Guide to American Indians of the Great Plains 149 (2003) (discussion of how, "[f]rom the Indian perspective, genetic heritage did not define cultural identity; behavior did"). Likewise, that the word "Indian" is used at all in this opinion and order is a byproduct of the long line of federal statutes and case law that has developed over the last two hundred plus years and throughout which the word "Indian" has come to define Native Americans as a legal term of art. See Cohen's Handbook of Federal Indian Law 1–3 (Nell Jessup Newton ed., 2019) [hereinafter Cohen].

States and brings this lawsuit against various federal Defendants seeking additional law enforcement resources the Tribe believes it was promised under those treaties and subsequent federal statutes.

In recent years, communities on the Reservation have struggled with dangerous and highly addictive drugs and experienced unprecedented levels of violence and threats to public safety. In the Tribe's view, a lack of competent and effective law enforcement on the Reservation is a big reason for the crisis. Neither party in this case disputes that the crime rate is very high on the Reservation and that law enforcement there is underfunded. Defendants however insist that the funding is fair given budget constraints and Congress's decision to underfund law enforcement services in Indian country generally. The Tribe brings this suit because it believes the lack of adequate law enforcement resources stems from the United States breaking treaty and statutory duties to provide those resources.

The pending motions frame the question of what, if any, duty Defendants have to fund tribal law enforcement on the Reservation. Evaluating what duty Defendants owe the Tribe requires examining the somewhat complex history between the United States and the Oglala Sioux Tribe. This Court concludes that the United States has a treaty duty unique to the Tribe to provide protection and law enforcement cooperation and support on the Reservation. Thus, this Court denies Defendants' Motion to Dismiss, Doc. 33, that asserts there exists no such duty at all. However, the Tribe has not shown at this stage that a duty extends to entitle the Tribe to the level of funding or support that it sought in its law enforcement and criminal investigations proposals, so this Court grants only in limited part the Tribe's Emergency Motion for Preliminary Injunction. Doc. 25.

## I.       Legal Standards

There are two pending motions before this Court: Plaintiff's Emergency Motion for Preliminary Injunction, Doc. 25, and Defendants' Motion to Dismiss, Doc. 33.   Ordinarily, this Court would address a motion to dismiss before a motion for preliminary injunction, but the two motions are substantially intertwined.    Much of Defendants' opposition to the motion for preliminary injunction argues that there is no cause of action stated or that could be stated by the Tribe.   And much of the likelihood-of-success-on-the-merits analysis necessary to ruling on the preliminary injunction motion requires addressing issues presented by the motion to dismiss.  This Court considers the motions together, but in ruling on Defendants' motion to dismiss[2] and the Tribe's motion for a preliminary injunction, this Court is guided by two different standards.

To survive a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), a complaint at a minimum must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).   Courts must accept the plaintiff's factual allegations as true and make all inferences in the plaintiff's favor but need not accept the plaintiff's legal conclusions.   Retro Television Network, Inc. v. Luken Commc'ns, LLC, 696 F.3d 766, 768–69 (8th Cir. 2012).   Although detailed factual allegations are unnecessary, the plaintiff must plead enough facts to "state a claim to relief that is plausible on its face[,]" meaning "the plaintiff pleads factual content that allows the court to draw the reasonable inference

---

[2] The Tribe argues that Defendants' motion to dismiss should be treated as a motion for summary judgment if this Court considers any facts set forth in the declaration and eight exhibits that Defendants submitted but that were not attached to the Tribe's amended complaint.  Doc. 43 at 22 (citing Fed. R. Civ. P. 12(d)).   Defendants respond that their combined brief in support included the declaration and exhibits because their motion to dismiss was also an opposition to the Tribe's motion for a preliminary injunction.  Doc. 55 at 35.   This Court will not treat Defendants' motion to dismiss as a summary judgment motion and will rely on the declarations, exhibits, and preliminary injunction hearing testimony only when considering the motion for preliminary injunction.

that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). Therefore, the "factual allegations must be sufficient to raise a right to relief above the speculative level." Cook v. George's, Inc., 952 F.3d 935, 938 (8th Cir. 2020) (cleaned up and citation omitted).

When ruling on a Rule 12(b)(6) motion, a court generally must ignore materials outside the pleadings, but it may "consider matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, items appearing in the record of the case, and exhibits attached to the complaint." Dittmer Props., L.P. v. FDIC, 708 F.3d 1011, 1021 (8th Cir. 2013) (cleaned up and citation omitted); see also Kushner v. Beverly Enters., Inc., 317 F.3d 820, 831 (8th Cir. 2003) (explaining that courts may also consider "documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading" (citation omitted)). "The consideration of judicially noticed facts, such as public court records, does not convert a motion to dismiss into one for summary judgment." Waldner v. N. Am. Truck & Trailer, Inc., 277 F.R.D. 401, 406 (D.S.D. 2011) (citing State ex rel. Nixon v. Coeur D'Alene Tribe, 164 F.3d 1102, 1107 (8th Cir. 1999)).[3]

On the other hand, when a district court considers preliminary injunctive relief, it evaluates (1) the movant's likelihood of success on the merits, (2) the threat of irreparable harm to the movant, (3) the balance of the equities between the parties, and (4) whether an injunction is in the public interest. Powell v. Ryan, 855 F.3d 899, 902 (8th Cir. 2017) (citing Dataphase Sys., Inc. v.

---

[3] Despite this Court declining the offer for supplemental briefing following the February evidentiary hearing, the Tribe filed a Request for Judicial Notice, Doc. 73, and a Motion for Leave to File a Supplemental Brief, Doc. 74. The request for judicial notice simply points this Court to additional historical materials relating to the treaties; it does not add much to what this Court has already received and found on its own. The motion for leave to file supplemental briefing is largely cumulative of the briefing already done, and as this Court remarked at the hearing, the initial briefing from both sides in this case was excellent.

C L Sys., Inc., 640 F.2d 109, 114 (8th Cir. 1981) (en banc)). "No single factor is dispositive, as the district court must balance all factors to determine whether the injunction should issue. However, in deciding whether to grant a preliminary injunction, likelihood of success on the merits is most significant." Turtle Island Foods, SPC v. Thompson, 992 F.3d 694, 699 (8th Cir. 2021) (cleaned up and citations omitted). A preliminary injunction is an "extraordinary remedy," and the burden of establishing that injunctive relief should enter rests with the movant. Watkins v. Lewis, 346 F.3d 841, 844 (8th Cir. 2003).

The issues raised by the motion to dismiss are primarily legal rather than factual, and those legal questions are for this Court to decide. The likelihood-of-success-on-the-merits analysis of the claims involves similar legal issues. The parties disagree about how to read and apply the treaties, statutes, and relevant history, but generally agree on many, though not all, of the basic underlying facts pertinent to this litigation. The Tribe maintains that there are several disputed factual issues, some of which they referenced in oral argument, Doc. 77 at 79–80, and others in briefing, Doc. 42 at 23–25. This Court will take the well-pleaded facts in the Tribe's amended complaint as true when ruling on the motion to dismiss but remains mindful that the Tribe has the burden to establish the elements justifying a preliminary injunction.

## II.    Facts

### A. The Reservation and its Law Enforcement Needs

The Pine Ridge Indian Reservation, covering approximately 3.1 million acres, is larger than the states of Rhode Island and Delaware combined. Doc. 24 ¶ 68. The Reservation has long experienced extreme poverty, high unemployment, poor health outcomes, and high levels of alcohol and substance use. The main Reservation county—Oglala Lakota County[4]—is among the

---

[4] Formerly known as Shannon County.

poorest counties in the United States. The high crime rate on the Reservation, which is just one aspect of the broader humanitarian crisis there,[5] adversely impacts both native and non-native Americans who live on or frequent the Reservation.

To illustrate the public safety crisis on the Reservation, in 2021 alone, there were 133,755 emergency 911-calls made for service on the Reservation, despite there only being roughly 40,000 people that the Tribe believes reside on or conduct business on the Reservation at any given time.[6]

---

[5] It can be difficult to gather accurate data from the Reservation, but research has shown that health outcomes for men and women on the Reservation are some of the worst in the Western Hemisphere. See generally Fact Sheets: Disparities, Indian Health Serv. https://www.ihs.gov/newsroom/factsheets/disparities/ (last visited May 15, 2023). At least one article notes that Lakọta Americans have the lowest life expectancy of any group in the United States. Kenneth Wienski, Leading Health Challenges Pine Ridge Indian Reservation, South Dakota Oglala Lakota Sioux, 1 Juniper Online J. Pub. Health 1, 1 (2017), https://juniperpublishers.com/jojph/pdf/JOJPH.MS.ID.555574.pdf. In nearly every category imaginable, Native Americans in South Dakota die at much higher rates than other Americans, including from self-harm and interpersonal violence, mental and substance use disorders, diabetes, urogenital, blood, and endocrine diseases, cirrhosis and other chronic liver diseases, and more. Laura Dwyer-Lindgren et al., US County-Level Trends in Mortality Rates for Major Causes of Death, 1980-2014, 316 JAMA 2385, 2394–98 (2016); Wienski, supra note 5. Unemployment rates, household income, and other socioeconomic trends are likewise concerning. See generally QuickFacts: Oglala Lakota County, South Dakota, U.S. Census Bureau, https://www.census.gov/quickfacts/fact/table/oglalalakotacountysouthdakota/PST045222 (last visited May 15, 2023) (noting an extremely high rate of poverty in Oglala Lakota County). According to the Supreme Court, the United States when it comes to the welfare of Native Americans has "charged itself with moral obligations of the highest responsibility and trust, obligations to the fulfillment of which the national honor has been committed." United States v. Jicarilla Apache Nation, 564 U.S. 162, 176 (2011) (cleaned up and citations omitted). At least on this Reservation, much more remains to be done beyond the subject matter of this decision to fulfill that moral obligation, but this case frames a question of the government's legal duty and not its moral obligation.

[6] The Tribe arrives at its 40,000 population estimate by taking into account Indian people who were registered as patients at the Pine Ridge Indian Health Service on-reservation Service Unit in 2019, people that the South Dakota Department of Transportation identified on their 2019 Traffic Flow Map as coming up or down South Dakota Highway 18 to the Reservation on a daily basis, and non-tribal members who either live on, work on, or visit the Reservation for personal or business purposes on a reoccurring basis but not through Highway 18. Doc. 3 ¶ 10; Doc. 43 at 19. Defendants at times cite much lower population numbers for the Reservation—anywhere from 19,800 to 32,000 people—but those census-derived numbers likely undercount the actual Reservation population for reasons discussed during the evidentiary hearing in this case. See, e.g.,

<u>Id.</u> ¶¶ 69, 75(A). Tribal police officers (who are employed by the Tribe but funded by the federal government through "638 contracts," <u>infra</u> pp. 65–68)[7] respond to 911-calls and other requests for law enforcement services within the Reservation, regardless of whether those calls are made by fellow tribal officers, tribal members, non-member Indians, non-Indians who live on the Reservation, those passing through or visiting the Reservation, other police departments, privately owned businesses, or other entities. Doc. 3 ¶ 11. In short, 911 dispatchers on the Reservation do not ask callers whether they are member Indians, non-member Indians, or non-Indians before dispatching a tribal police officer. Under the Tribe's contract with the federal government, tribal police must "maintain[] continual law enforcement and prevention services to all land within the jurisdiction of the Oglala Sioux [T]ribe including, but not limited to, all reservation and trust properties, 24 hours per day and 7 days per week." Doc. 36-4 at 14.

In the Tribe's view, the standard law-enforcement-to-population ratio that is necessary to maintain a competent and effective police force is 2.8 officers per 1,000 people. Whether this is in fact a "standard" is intensely disputed by the parties and discussed further below. The Tribe applies this disputed "standard" to its service population and geographically large coverage area to calculate that it needs at least 112 officers to competently and effectively serve the Reservation, but the Tribe presently has funding for less than half of that number. Doc. 24 ¶¶ 72–73. At any given time over the last several years, the Tribe has only had funding to employ roughly 33 police officers and 7 criminal investigators to cover all of its 911-calls.[8] <u>Id.</u> ¶ 73. By comparison, the

---

Doc. 35 at 25; Doc. 77 at 39; Doc. 77-1 at 47, 139–44. This decision leaves open the question of what the actual service population on the Reservation is.

[7] The formal name for the Tribe's police force is the "Oglala Sioux Tribe Department of Public Safety."

[8] While for the purposes of resolving the motion to dismiss, this Court must take the Tribe's number of how many police officers it has as true, Defendants do provide a slightly different number in their opposition to the motion for preliminary injunction. Doc. 36 ¶ 19. According to the

nearest municipality of significant size—Rapid City, South Dakota—has 176 police officers, and in 2021 the Rapid City Police Department responded to almost 20,000 fewer 911-calls than were made on the Reservation.[9] Id. ¶ 98.

Not only does the understaffed tribal police department on the Reservation field an inordinately large number of 911-calls for such a rural area, but those calls are for increasingly violent, dangerous, and tense emergencies. Id. ¶ 75. Calls for service in 2021 included 794 calls involving an assault, 1,463 domestic violence calls, 522 gun-related calls, 541 drug/narcotic calls, and 541 calls reporting missing persons. Id. ¶ 75(A). At any given time, because only six to eight (sometimes fewer) tribal police officers are on duty to respond to emergency calls,[10] many 911 calls on the Reservation are abandoned, not properly investigated, and in turn involve crimes that are not prosecuted. Id. ¶¶ 74, 75(B). Even in cases of domestic violence, gun activities, and other

---

Defendants, the federal government allocated just under four million dollars to the Tribe for law enforcement services in fiscal year 2019, and the Tribe used those funds to employ at least 62 people, including 1 chief of police, 2 captains, 10 lieutenants, 37 uniformed patrol officers, 2 communications supervisors, and 10 communications officers. Doc. 36 ¶ 19. The exact number of officers employed by the Tribe varies from time-to-time with staff turnover and funding changes, but in general, it appears that the Tribe's police department consistently has fewer than 50 officers employed to respond to routine service calls, given that uniformed patrol officers and lieutenants are typically the ones who respond to 911 calls.

[9] Rapid City is an awkward comparison because it has more people than the Reservation but is much smaller geographically. Rapid City has a population of approximately 75,000, but it has a thriving tourism industry and is the center of medical care, shopping, entertainment, and services for western South Dakota such that perhaps over 100,000 people are within the city boundaries at any given time during tourist season. Rapid City's geographic size is just over 55 square miles whereas the Reservation is about 3,468 square miles in size.

[10] There are many times when on-duty officers are unavailable for calls; for example, when a tribal police officer apprehends someone who meets certain criteria (such as having a blood alcohol content over a specified limit or an apparent injury), the officer is required to obtain a medical clearance for that person before booking them into one of the Tribe's detention facilities. That process can and does take hours, and officers cannot respond to new calls while they are in the process of transporting someone to one of the medical facilities located on the Reservation. Doc. 77 at 143–44; see also Hr'g Ex. 35 (recording time OST officers spent obtaining medical clearances).

imminent threats of harm, police response times on the Reservation often exceed 30 minutes.  Id. ¶ 75(D).  According to the Tribe's Chief of Police, the sheer size of the Reservation and low staffing levels make it impossible to adequately cover every tribal community with prompt response times.  Doc. 3 ¶ 22.  Tribal police are driving so many miles per shift that they sometimes are forced to fill their cars with gas multiple times per day, costing the Tribe nearly $45,000 a month in fuel costs alone.  Doc. 24-7 ¶¶ 15–16.  For 911-calls where law enforcement responds, typically only one police officer is available to go to the scene.  That officer often has to drive at high speeds into potentially dangerous situations, with no realistic hope for backup; sometimes the officer is doing so at the tail end of a shift or while on overtime duty.  Doc. 24 ¶ 75(C), I, (H).

The 911-calls and crime on the Reservation in 2022 were similar to 2021, but with gun violence continuing to escalate.  Id. ¶¶ 78–81.  From October 2021 to September 2022, the Tribe's police department logged 12 weapons offenses in school-related incidents alone.  Hr'g Ex. 33. The Tribe has struggled with officer turnover because of the stressful working conditions and salaries not commensurate with the demands of the job.  Doc. 24-7 ¶ 21.  The Oglala Sioux Tribal Council declared a state of emergency in May 2022 due to criminal activity and public safety concerns surpassing the ability of tribal police to handle.  Doc. 5 ¶ 13.  According to the Tribe's Chief of Police, he "regularly receive[s] complaints from [Tribal officials and members] that they, and/or members of their families, are often scared to venture out of their homes at night, especially now that gunshots are heard throughout the Reservation on a frequent and re-occurring basis." Doc. 3 ¶ 27.  Those operating on-Reservation schools, health facilities, programs, and local businesses reportedly feel unsafe due to the lack of law enforcement; some have chosen to close their businesses rather than to risk remaining open after dark.  Doc. 24 ¶ 76(A), (D).  Testimony at the evidentiary hearing made clear that the level of violent crime, drug trafficking, gang activity,

and trauma on the Reservation is staggering, unprecedented, and overwhelming law enforcement resources. See, e.g., Doc. 6 (affidavit of Tribal Attorney General).

### B. Oglala Sioux Tribe Law Enforcement

For over forty years, the Tribe has administered its own law enforcement programs on the Reservation using federal dollars it obtains through contracts with the United States government. Doc. 24 ¶ 108. Prior to 1998, the Bureau of Indian Affairs ("BIA") provided the Tribe with law enforcement funding through the Tribal Priority Allocation system ("TPA"). The TPA is BIA's "budget formulation process that allows direct tribal government involvement in the setting of relative priorities for local operating programs." 25 C.F.R. § 46.2 (2022). It "provides a tribe with a lump sum of money derived from combining the federal appropriations from a variety of BIA programs." Doc. 24 ¶ 84. Tribes then allocate their combined TPA funds to a set list of federally funded BIA programs, including those related to tribal government operations, human services, child welfare, and more. Id. Back in 1998, law enforcement was included in the list of BIA programs funded through the TPA system. Id.

Because of other federal grant programs available to the Tribe for law enforcement funding in the late 1990s, the Tribe had allocated a greater share of its TPA money into other areas of need outside of law enforcement. Id. ¶ 85; Doc. 7 ¶ 6. Those grants—the Comprehensive Indian Resources for Community and Law Enforcement ("CIRCLE") grant and Community Oriented Policing Services ("COPS") program, among others—helped the Tribe fund a significant percentage of its police force on the Reservation from 1999 to 2006. Doc. 24 ¶¶ 86, 90. The level of combined federal law enforcement funding available to the Tribe through TPA and grant monies during those years reduced on-Reservation crime. Id. ¶ 89. Knowing that the grants were limited-time funding, the Tribe applied for and accepted CIRCLE and COPS funds "with the

understanding that BIA would absorb the costs of those additional law enforcement positions when the grants ran out." Id. ¶ 87.

In 1999, around the same time the Tribe accepted the grants, BIA changed the way it funded law enforcement; instead of funding tribal police through the TPA system with the other federal Indian programs as it had done throughout the early 1990s, BIA began funding tribal law enforcement separately. Id. ¶ 91. With the new separate funding system, BIA set the Tribe's base law enforcement budget[11] according to what the Tribe allocated to law enforcement in 1999 under the previous TPA program; because CIRCLE and COPS grants defrayed substantial costs of law enforcement until 2006, the Tribe's base law enforcement amount under the new system was much lower than the Tribe's policing needs or its total actual spending on law enforcement with the combined TPA and grant monies. Id. ¶ 93. This did not concern the Tribe at the time because it believed that BIA would absorb the costs for the grant-funded officer positions when the grants expired. Id. ¶ 92.[12]

But BIA did not absorb the costs for the grant-funded officer positions when the grants expired. Id. When the CIRCLE and COPS grants ended around March 2006, the Tribe lost funding for approximately 59 police officers—roughly half of its police force. Id. ¶ 93.

According to the Tribe, "[e]ven though the BIA's own data shows that the Oglala Sioux Tribe needs more than 112 police officers to fight on-Reservation crime, its current BIA law enforcement TPA base funding has not changed since 1999."[13] Id. ¶ 97. The Tribe attests that the

---

[11] The base funding amount is sometimes referred to as the "secretarial amount."

[12] According to the Tribe, it "included, and both the BIA and DOJ were aware that it included, in its grant applications a clear statement that the cost of those [grant-funded] officers would be absorbed by the BIA's law enforcement program" and "DOJ never questioned th[o]se statements." Doc. 24 ¶ 87.

[13] Defendants contest this assertion, noting that BIA annually evaluates which tribes should receive increases in their 638 contracts for law enforcement, so the Tribe now is decades removed from

BIA's "single, arbitrary . . . decision, which it continues to repeat annually," to use historical funding amounts (i.e. the artificially low amount the Tribe allocated to law enforcement under the TPA system in 1999 when it had access to grant monies) to set the Tribe's base budget violates Defendants' duty to provide competent and effective law enforcement on the Reservation. Id. ¶ 95. The Tribe also contests how BIA calculates the estimated law enforcement service population on the Reservation; Defendants put the service population on the Reservation at approximately 19,000, while the Tribe estimates the service population is closer to 40,000, although it is not clear exactly how the service population number actually figures into the amount of funding the Tribe receives from year to year.[14]

Over the years, the Tribe has stressed to the federal government that its law enforcement funding is inadequate and repeatedly notified the Defendants of the public safety crisis on the Reservation. Id. ¶ 101; Doc. 3 ¶¶ 40–45; Doc. 4 ¶ 35; Doc. 7 ¶¶ 13, 16–17. In the Tribe's view, the Defendants have continually failed to address rampant shortfalls in law enforcement funding despite having been kept abreast of the worsening situation on the Reservation. Doc. 24 ¶ 104; Doc. 7 ¶ 16. At the preliminary injunction hearing, counsel for Defendants argued that the Tribe has been given everything it is entitled to under law but admitted that "Congress annually identifies

---

that base funding level. Defendants also point to data that the Tribe receives a large allocation relative to other tribes. But then again, the Tribe is one of the most populous tribes and on a relatively large reservation, and counsel for Defendants conceded during the February hearing that the historical funding amount "is the primary basis on which funds are awarded to a tribe." Doc. 77 at 39.

[14] Defendants also point out that BIA has a methodology for allocating new funds that Congress appropriates for Indian law enforcement in a given year. Doc. 35 at 24. In general, that methodology increases law enforcement funding above the prior year's amount to tribes under 638 contracts based on reported crime rates, staffing-level shortages, drugs and gang activity, detention facility shortages, reported calls for service, and size of land base covered. Id. The Tribe, however, points out that BIA does not make public how it weighs these criteria in awarding new funds and that notwithstanding these criteria, the Tribe still receives less funding than required to effectively operate its tribal police.

a need for law enforcement resources in Indian country that far exceeds the amount of funds that Congress then appropriates to BIA OJS."[15]  Doc. 77 at 42.  In other words, Defendants understand that they are defending a system that is chronically underfunded nationwide.  Id.

### C.  December 2021 Proposals and Partial Declinations

Because of increasing public safety concerns, the Tribe in December 2021 requested renewed negotiations with Defendants over its federally-funded tribal law enforcement contracts. Doc. 24 ¶ 109; Doc. 3 ¶ 47.  The Tribe's contract with the federal government for law enforcement and criminal investigations funding had expired, so the Tribe proposed what it viewed as "minimum, non-controversial" funding increases for the new contract term.  Doc. 24 ¶ 110; Doc. 3 ¶ 46.  The Tribe's proposed increases "were not based on the Tribe's actual need" but instead on what it thought BIA OJS might grant.  Doc. 24 ¶ 110.

The Tribe submitted requests to Defendants for two separate 638 contracts: one for law enforcement and one for criminal investigations.  Doc. 3 ¶ 48; Hr'g Ex. 54 (law enforcement proposal); Hr'g Ex. 55 (criminal investigations proposal); see also Hr'g Ex. 16 (approving proposed contracts for law enforcement and criminal investigation programs by resolution of Oglala Sioux Tribal Council); Doc. 36-3 (cover letter from OST President to BIA attached to contract proposals).[16]  The law enforcement proposal sought federal funding in the amount of $9,628,345.00, plus funds to start a new school resource officer program and drug dog detection team.  Hr'g Ex. 54 at 1, 8, 53.  Supporting the law enforcement proposal was a resolution of the Oglala Sioux Tribal Council, which noted the growing public safety crisis on the Reservation and

---

[15] "BIA OJS" means the Department of Interior's Bureau of Indian Affairs' Office of Justice Services, through which runs funding for tribal law enforcement.

[16] The contract proposals were not attached to the amended complaint but do otherwise appear in the record.  See, e.g., Hr'g Exs. 54–55.  Because the amended complaint discusses the proposals at length, this Court can consider their contents in ruling on the motion to dismiss.

stated that the Tribe's "Department of Public Safety must have an increase in funding to properly meet the needs of law enforcement services." Id. at 1.  The criminal investigations proposal echoed similar concerns and stated that "there is a need for increased funding to provide criminal investigation services that can adequately meet the need for investigations of crimes committed within the jurisdiction of the Oglala Sioux Tribe including investigation of drug-related crimes, crimes of violence, and for missing and murdered indigenous people." Hr'g Ex. 55 at 1.  The criminal investigations proposal aimed to fund an internal affairs division within the tribal police department to address internal investigations in a more timely manner.  Id.  The Tribe sought $2,211,159.00 in additional federal funding, plus start-up costs, to initiate new missing and murdered indigenous persons,[17] drug enforcement, and internal affairs programs, as well as to expand criminal investigations services. Id. at 2.

---

[17] The Tribe's desire to start a murdered and missing indigenous persons ("MMIP") unit is understandable considering the sheer number of MMIP cases.  Missing and Murdered Indigenous People Crisis, U.S. Dep't Int. Indian Affs., https://www.bia.gov/service/mmu/missing-and-murdered-indigenous-people-crisis (last visited May 10, 2023).  Of the cases on South Dakota's missing persons database, 62% are Native American, with the largest group being Native women, despite only 8.7% of the state's population identifying as Native American.  Annie Todd, MMIP and human trafficking coordinators hired by South Dakota Attorney General's office, Argus Leader (Nov. 30, 2022, 1:49 PM), https://www.argusleader.com/story/news/2022/11/30/south-dakota-ag-hires-mmiw-missing-murdered-indigenous-people-investigators/69688819007/; Jamie Jackson, Missing from the conversation: The epidemic of missing Indigenous women, Keloland (Mar. 9, 2022, 12:39 PM), https://www.keloland.com/keloland-com-original/missing-from-the-conversation-the-epidemic-of-missing-indigenous-women/.   The epidemic of missing and murdered Indigenous women is deeply troubling especially given that the United States only started collecting data on the issue in 2019. Todd, supra note 17; see also Sovereign Bodies Inst. & Brave Heart Soc'y, Zuya Winyan Wicayuonihan Honoring Warrior Women: A study on missing & murdered Indigenous women and girls in states impacted by the Keystone XL pipeline, 6 https://2a840442-f49a-45b0-b1a1-7531a7cd3d30.filesusr.com/ugd/6b33f7_27835308ecc84e5aae8ffbdb7f20403c.pdf (last visited May 15, 2023) (noting that MMIW has been a crisis since first contact and attributing rising number of cases to better data collection).  This is especially true considering that available data almost certainly underestimates the extent of the crisis.  Missing and Murdered Indigenous People Crisis, supra note 17; Missing and Murdered Indigenous Women (MMIW), Native Hope, https://www.nativehope.org/missing-and-murdered-indigenous-women-mmiw (last visited May

After submitting the proposals, the Tribe received two separate letters from BIA dated January 28, 2022.  Doc. 5-1; Doc. 5-2.  Each letter addressed issues in the proposals that BIA thought needed to be further clarified, corrected, or resubmitted.  BIA asked the Tribe to address those issues and get back to the agency by February 18, 2022.

On the law enforcement proposal, BIA noted three potential reasons it might be declined, and recommended four corrections and clarifications to the proposal.  Doc. 5-2 at 1–3.  Among other things, the letter noted that the Tribe's request for roughly $9.6 million in the law enforcement proposal may have inadvertently included around $2.4 million in costs that should have been budgeted separately.  Id. at 2.  By BIA's calculation, the Tribe's actual law enforcement request was for around $7,222,724.66, which would be an increase in funding of over $3 million—more than a 75% increase—from the Tribe's previous law enforcement contract.  Id.  The letter stated there was no funding available for any individual tribe's request to add a new school resource officer program.  Id.  BIA directed the Tribe to revise the law enforcement proposal to reduce the funding request to the amount the Tribe received under its prior 638 contract and eliminate the request for any school resource officer program.  Id. at 3.  The letter went on to make further, less substantive suggestions on how the Tribe should revise the proposal as to form.  Doc. 5-2 at 3–4.

The letter from BIA on the Tribe's criminal investigations proposal was similar.  Doc. 5-1.  It noted the Tribe's request for $2.2 million was incorrectly calculated and that the criminal

---

12, 2023).  Thousands of these cases remain unsolved due to a lack of investigatory resources. Missing and Murdered Indigenous People Crisis, supra note 17.  For a list of some of the Native American women who have gone missing in South Dakota, see Annie Todd, South Dakota's open cold cases include these missing and murdered indigenous women, Argus Leader (May 10, 2022, 6:12 AM), https://www.argusleader.com/story/news/2022/05/10/south-dakota-missing-murdered-indigenous-women-cold-cases/9233243002/.

investigation's proposal really was requesting closer to $1.6 million. Id. at 2.  According to BIA, this request also sought more than what was allocated for the Tribe, exceeding the Tribe's previous funding level by $310,592.24. Id.  The letter stated there was no funding available to accommodate the Tribe's request to add new programs for missing and murdered indigenous persons, drug enforcement, internal affairs, and criminal investigations. Id. at 3.  As with the other letter, along with some technical suggestions, BIA directed the Tribe to revise its request to match the amount it was previously being funded for criminal investigations and to remove its requests for the new programs. Id.

The Tribe deemed the January letters violative of the Defendants' obligation to negotiate in good faith, so the Tribe did not respond to BIA's suggestions.  Doc. 24 ¶ 116.  Instead, the Oglala Sioux Tribal President and members of the Oglala Sioux Tribal Council traveled to Washington, D.C. during the first week of March 2022 and met personally with senior government officials, including Defendant Secretary of the Department of Interior Deb Haaland.  Id. ¶ 117.  Those meetings were apparently unfruitful. Id. ¶ 117.

On March 30, 2022, BIA issued two final decision letters partially denying the Tribe's law enforcement and criminal investigations proposals and agreeing only to provide the Tribe with funding consistent with what it had received in the past.  Id. ¶ 118; Doc. 24-1 (criminal investigations partial denial letter approving only $1,327,781 in base funding); Doc. 24-2 (law enforcement partial denial letter approving only $4,026,171 in base funding).  The decision letters largely parroted the January 2022 letters.  See Doc. 24-1 at 2 ("Pursuant to 15 U.S.C. § 5321(a)(2)(D), the BIA OJS declines the amount of funds for the [criminal investigations] program that are in excess of the Secretarial Amount."); Doc. 24-2 at 2 ("Pursuant to 15 U.S.C. § 5321(a)(2)(D), the BIA OJS declines the amount of funds for the LE Program that are in excess of

the Secretarial Amount."). The letters further explained that the Tribe could not receive funding for the school resources officer, drug enforcement, missing persons, or internal affairs programs because those functions are carried out by BIA nationwide and are ineligible for contracting with individual tribes. Doc. 24-1 at 3; Doc. 24-2 at 3.

After receiving the March 2022 partial declination letters, the Tribe conditionally agreed to accept the contract portions not declined and advised Defendants that it was pursuing its legal options. Doc. 24 ¶ 119. On April 13, 2022, Oglala Sioux Tribe President Kevin Killer sent a letter to federal officials

> as formal notice that the United States is in flagrant violation of Articles 1 and 5 of the 1868 Treaty of Fort Laramie in that it has refused to engage in reasonable efforts to preserve the peace on the Pine Ridge Indian Reservation by assuring the proper level of law enforcement and criminal investigations services required to protect the people and property of the Oglala Sioux Tribe and its Members.

Doc. 5-4 at 3; Doc. 24 ¶ 120. This lawsuit soon followed.[18]

**D. Procedural History**

The Tribe's amended complaint includes seven claims for relief under various federal statutes and treaties. Doc. 24 ¶¶ 41–63. The Tribe's first claim seeks a declaratory judgment under 28 U.S.C. § 2201 stating that "the United States is legally obligated to provide for and to ensure competent and effective law enforcement to the Tribe within the Pine Ridge Indian Reservation." Id. ¶¶ 140–41; see also 28 U.S.C. § 2201. To support this request, the Tribe cites three separate treaties between the United States and the Tribe, four acts of Congress, and the general trust relationship between the United States and the Tribe. Doc. 24 ¶ 141.

---

[18] The Defendants note that in September 2022, BIA allocated additional one-time funds from the American Rescue Plan to the Tribe and advised it could be used for law enforcement programs. Doc. 35 at 27. The Defendants also note that in October 2022, BIA offered technical assistance to the Tribe regarding how it might take title to federal buildings on the Reservation to garner additional compensation. Doc. 35 at 27–28. In the Tribe's view, none of this was enough to satisfy the government's treaty and statutory duties.

The Tribe's second claim alleges mismanagement and seeks an accounting under <u>Cobell</u> <u>v. Babbitt</u>, 30 F. Supp. 2d 24 (D.D.C. 1998) and other cases, asserting that Defendants have a treaty and trust responsibility to provide the Tribe with an accounting of the use of funds requested from and allocated by Congress for tribal law enforcement services from 1998 to the present time. Doc. 24 ¶ 152.  The Tribe seeks a declaratory judgment and

> an order compelling the Defendants to provide a detailed accounting to the Tribe of its appropriations requests to the Department of the Interior (DOI), to OMB[19] and to the Congress and the responses thereto, and of the funds received and used by each individual division of BIA and OJS from 1998 through the present date for law enforcement services.

<u>Id.</u> ¶ 154.

The third through sixth claims ask this Court to declare that Defendants violated the Indian Self-Determination and Education Assistance Act ("ISDEAA"), 25 U.S.C. § 5321(a)(1)(E) and (a)(2), and 25 C.F.R. § 900.29, by declining or partially declining the Tribe's contract proposals, which among other things sought to increase or reallocate federal funding for law enforcement and criminal investigation programs on the Reservation.  Doc. 24 ¶¶ 155–215; <u>see also</u> Doc. 24-1; Doc. 24-2.  The Tribe also seeks an order requiring, among other things, that Defendants approve and fund the Tribe's proposed contracts.  Doc. 24 ¶¶ 164, 171, 188, 215.  The Tribe's seventh and final claim seeks declaratory and injunctive relief under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706, based on the denial of the funding the Tribe sought under ISDEAA.  Doc. 24 ¶¶ 216–26.

On October 25, 2022, the Tribe filed a Motion for an Expedited Preliminary Injunction. Doc. 25.  The Tribe asked for a four-part preliminary injunction that:

---

[19] OMB is the Office of Management and Budget.

(1) Restrains Defendants from continuing to assign a base [ISDEAA] law enforcement funding amount to the Tribe based upon the Tribe's 1999 TPA law enforcement budget[;]

(2) Restrains Defendants from continuing to use an outdated and arbitrary law enforcement service population base . . . for purposes of providing law enforcement resources and funding[;]

(3) Compels Defendants [OJS] and [BIA] to immediately provide the Tribe with sufficient law enforcement resources to address the ongoing public safety crisis on the Pine Ridge Reservation . . . and;

(4) Grants Plaintiff such other interim relief at law or in equity that the court finds is appropriate and necessary to alleviate the public safety crisis on the Pine Ridge Reservation[.]

Doc. 25 at 6 (cleaned up).  In response, Defendants filed a Motion to Dismiss Plaintiff's Amended Complaint, Doc. 33, and a Combined Opposition to Plaintiff's Motion for a Preliminary Injunction and Memorandum in Support of their Motion to Dismiss Plaintiff's Amended Complaint, Doc. 35.

Shortly after this case was reassigned to the undersigned judge, on February 8 and 9, 2023, this Court held a two-day evidentiary hearing on the motion for preliminary injunction.  See Doc. 77 (transcript of February 2023 evidentiary hearing).  This Court heard testimony from several of the Tribe's witnesses, received many exhibits, and considered oral argument from both sides.

III.    **Motion to Dismiss**

A. **Treaty Duty**

*1.  Overview*

Whether the Tribe's amended complaint states a cause of action hinges primarily on whether the United States owes the Tribe some duty concerning law enforcement on the Reservation and the scope of any such duty.  Those same questions drive whether the Tribe can show a likelihood of success on the merits to justify entry of any preliminary injunction.  Because the existence of a duty is purely a question of law, see generally Washington v. Washington State Com. Passenger Fishing Vessel Ass'n, 443 U.S. 658, 675–76 (1979); Sioux Tribe v. United States,

500 F.2d 458, 462 (Ct. Cl. 1974), this Court combines discussion on what, if any, duty the United States owes the Tribe concerning law enforcement on the Reservation in ruling on both pending motions.

The Tribe points to several sources to support its claim that the United States has a legal obligation to provide competent and effective law enforcement on the Reservation: namely, an 1825 Treaty between the Sioux and the United States ("1825 Treaty"); the 1851 Treaty of Fort Laramie ("1851 Treaty"); the 1868 Treaty of Fort Laramie ("1868 Treaty"); congressional appropriations acts, most specifically the act passed in 1877 ("1877 Act"); the Snyder Act of 1921, ("Snyder Act"); the ISDEAA of 1975; the Indian Law Enforcement Reform Act of 1990 ("ILERA"); and the Tribal Law and Order Act of 2010 ("TLOA").  Doc. 24 ¶ 3.  According to the Tribe, these treaties and statutes, along with the general trust relationship between the United States and all Indian tribes, obligate the Defendants

> to provide sufficient resources to ensure the competent reporting and investigation of all crimes, and the arrest and punishment of all offenders who violate federal law and (pursuant to federal statute) tribal law, or otherwise threaten or harm the Tribe or its property, or the person or property of any Tribal member.

Id. ¶ 19.  In its preliminary injunction motion, the Tribe asserts that this duty obliges the Defendants "to immediately provide the Tribe with sufficient law enforcement resources to address the ongoing public safety crisis on the Pine Ridge Reservation pending the outcome of this litigation." Doc. 25 at 6.

The Tribe's request for injunctive relief essentially seeks greater funding of tribal law enforcement, which is a viable claim only if there is a more particular duty than one arising under the general fiduciary relationship the United States owes to Native Americans.  The Supreme Court of the United States has repeatedly affirmed "the undisputed existence of a general trust relationship between the United States and the Indian people." Jicarilla Apache Nation, 564 U.S.

at 176 (quoting United States v. Mitchell, 463 U.S. 206, 225 (1983)).  A tribe cannot, however,

recover money damages from the government under a claim for breach of the general trust duty

standing alone.  See Mitchell, 463 U.S. at 216–18, 225; United States v. Navajo Nation, 556 U.S.

287, 302 (2009) (acknowledging that a tribe must point to the violation of a "specific, applicable,

trust-creating statute or regulation that the Government violated" before common law principles

of the trust relationship apply to establish a violation of a trust responsibility).  To maintain a claim

for monetary damages for a breach of the trust relationship, a tribe must identify specific treaty

provisions, Congressional statues or regulations, or a specific trust corpus that the United States

has agreed to safeguard.  See United States v. Navajo Nation, 537 U.S. 488, 506 (2003); Cohen,

supra note 1, §§ 5.05[l][b], [2].  A tribe does not however need to identify a document that says

"in specific terms that a trust or fiduciary relationship exists or is created" to maintain a breach of

trust claim where there is federal supervision or control of tribal monies or properties, because

"[t]he existence vel non of the relationship can be inferred from the nature of the transaction or

activity."  Navajo Tribe of Indians v. United States, 624 F.2d 981, 987 (Ct. Cl. 1980); see also

Mitchell, 463 U.S. at 225; Seminole Nation v. United States, 316 U.S. 286, 296–300 (1943).

When a tribe seeks only equitable relief, as the Tribe does here, courts examine the relevant

federal statutes, regulations, and treaties to determine whether a claim for breach of a trust duty

exists, and if it does, the scope of that duty.  Blue Legs v. U.S. Bureau of Indian Affs., 867 F.2d

1094, 1100 (8th Cir. 1989) ("The existence of a trust duty between the United States and an Indian

or Indian tribe can be inferred from the provisions of a statute, treaty or other agreement, reinforced

by the undisputed existence of a general trust relationship between the United States and the Indian

people."  (internal quotation removed)); Cohen, supra note 1, § 5.05[1][a].  In either case, "[i]n

order 'to establish a trust duty,' the burden is on the Tribe to 'identify a substantive source of law

that establishes specific fiduciary or other duties, and allege that the Government has failed faithfully to perform those duties.'" <u>Cheyenne River Sioux Tribe v. Jewell</u>, 205 F. Supp. 3d 1052, 1061 (D.S.D. 2016) (quoting <u>Navajo Nation</u>, 537 U.S. at 506). In short, "[a]lthough the Tribe seeks a declaratory [judgment], the Tribe still must identify a substantive source of the duty." <u>Rosebud Sioux Tribe v. United States</u>, 9 F.4th 1018, 1023 (8th Cir. 2021).

The question for this Court, then, is "whether the Treat[ies] and other relevant statutes *when read in conjunction* create a duty" owed by the United States to the Tribe concerning law enforcement within the Reservation, and if so, the scope of that duty. <u>Id.</u> (emphasis added). This Court must answer this question before determining whether the Tribe's amended complaint has stated claims for relief upon which relief may be granted and whether the Tribe is likely to succeed on the merits of any of those claims.

This Court begins by considering each of the treaties cited by the Tribe in support of its claim that the United States has a law enforcement duty on the Reservation. "[T]reaties should be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit." <u>Id.</u> (quoting <u>Cnty. of Oneida v. Oneida Indian Nation of N.Y.</u>, 470 U.S. 226, 247 (1985) (citations omitted)). <u>But see</u> <u>Choctaw Nation of Indians v. United States</u>, 318 U.S. 423, 432 (1943) ("But even Indian treaties cannot be re-written or expanded beyond their clear terms to remedy a claimed injustice or to achieve the asserted understanding of the parties."). Courts are to "look beyond the written words to the larger context that frames the Treaty, including 'the history of the treaty, the negotiations, and the practical construction adopted by the parties.'" <u>Minnesota v. Mille Lacs Band of Chippewa Indians</u>, 526 U.S. 172, 196 (1999) (quoting <u>Choctaw Nation of Indians</u>, 318 U.S. at 432). To follow the directive to consider "the larger context that frames the Treaty," <u>id.</u>,

this Court necessarily must also delve into the history surrounding the treaties and the Tribe's relationship with the United States.[20]

### 2. *1825 Treaty*

During the early nineteenth century, the United States had only a minor presence in the Great Plains region; after all, it was not until the Louisiana Purchase in 1803 that the federal government even laid claim to the territory west of the Mississippi River. At the time, the Lakota people had become relatively dominant along the middle Missouri River. See Reinhardt, supra note 1, at 11; Thomas Biolsi, Organizing the Lakota: The Political Economy of the New Deal on the Pine Ridge and Rosebud Reservations 4 (2d prtg. 1998). It was in this context that an expedition led by General Henry Atkinson entered into the 1825 Treaty with the Sioux, including some Oglalas. Reinhardt, supra note 1, at 11.

Most Great Plains tribes did not yet feel seriously threatened by expansion of the United States in the 1820s and 1830s, although contact with non-Indians was becoming more frequent.

---

[20] As this Court has remarked before, the history surrounding Native Americans' relationship with the United States has a great deal of misfortune and tragedy to it. See Noem v. Haaland, 542 F. Supp. 3d 898, 907 n.1 (D.S.D. 2021). The tragic history of the westward expansion of the United States and its impact on native people, however, does not single-handedly define the Tribe's history. Colonialism is just one, albeit significant and ongoing, chapter in the long history of the Oglala Lakota people. Their many resilient and sacred traditions are equally deserving of inclusion in the chronology of the Tribe. Of course, a full history of the Tribe or any one of the hundreds of separate federally-recognized Indian tribes is beyond the scope of this lawsuit and likely better told by the tribes themselves. A group of Lakota students from the Taopi Cikala Owayawa (Little Wound School) in Kyle, South Dakota, recently did just that with their "Heart of All Oral History Project," a seven episode audio series funded by the National Endowment for the Humanities telling the story of the Lakota nation through the oral tradition in which native history has been handed down for generations, available at https://www.heartofallohp.com/episodes. For further reading, this Court wrote a summary of the federal government's relationship with Native Americans for the benefit of the United States Sentencing Commission and later attached it to a decision. See United States v. Erickson, 436 F. Supp. 3d 1242, 1259–72 (D.S.D. 2020), aff'd, 999 F.3d 622 (8th Cir. 2021) (Timeline of Native American History and Indian Law). That summary has been used as a training tool for federal agencies and as a supplement to law school courses on Federal Indian Law and assists in putting the Tribe's relationship with the United States into a larger historical context.

See, e.g., Jeffrey Ostler, The Plains Sioux and U.S. Colonialism from Lewis and Clark to Wounded Knee 32 (Frederick Hoxie & Neal Salisbury eds., 2004); Robert W. Larson, Red Cloud: Warrior-Statesman of the Lakota Sioux 51–52 (Richard E. Etulain ed., 1997).  According to the Tribe, the major goal of the United States government in entering into the 1825 Treaty was to "secure free trade in the area and stop groups from attacking non-Indians in response to the criminal violations that Tribes were sustaining at the time."  Doc. 25 at 20.  That assertion is supported somewhat by the opening text of the 1825 Treaty itself, which explains its purpose as "remov[ing] all future cause of discussion or dissension, as it respects trade and friendship between the United States and their citizens, and the Sioune and Ogallala bands of the Sioux tribe of Indians[.]"  Treaty with the Sioune and Oglala Tribes, 1825, July 5, 1825, 7 Stat. 252 [hereinafter 1825 Treaty].  Defendants largely agree that the 1825 Treaty was meant to bring peace to the region by ending hostilities between the United States and the tribes but insist that nothing in the text of the 1825 Treaty can be interpreted as obligating the United States to provide the Tribe with the law enforcement support it seeks.  Doc. 35 at 44–46.

The Tribe cites several sections of the 1825 Treaty to support its argument that the United States is obligated to provide competent and effective law enforcement on the Reservation:

### ARTICLE 1

It is admitted by the Sioune and Ogallala bands of Sioux Indians, that they reside within the territorial limits of the United States, acknowledge their supremacy, and *claim their protection*.  The said bands also admit the right of the United States to regulate all trade and intercourse with them.

### ARTICLE 2

The United States agree to receive the Sioune and Ogallala bands of Sioux into their friendship, and *under their protection*, and to extend to them, from time to time, such benefits and acts of kindness as may be convenient, and seem just and proper to the President of the United States.

. . . .

## ARTICLE 5

That the friendship, which is now established between the United States and the Sioune and Ogallala bands *should not be interrupted by the misconduct of individuals*, it is hereby agreed, that for injuries done by individuals, no private revenge or retaliation shall take place, but instead thereof, complaints shall be made, by the injured party, to the superintendent or agent of Indian affairs, or other person appointed by the President; *and it shall be the duty of said Chiefs, upon complaint being made as aforesaid, to deliver up the person or persons, against whom the complaint is made, to the end that he or they may be punished agreeably to the laws of the United States*. And, in like manner, if any robbery, violence or murder, shall be committed on any Indian or Indians belonging to the said bands, the person or persons so offending shall be tried, and if found guilty shall be punished in like manner as if the injury had been done to a white man. . . . And the said Sioune and Ogallala bands engage, on the requisition or demand of the President of the United States, or of the agents, to deliver up any white man resident among them.

1825 Treaty, supra, art. 1–2, 5 (emphasis added).  Textually, Articles 1 and 2 of the 1825 Treaty give the Tribe a "claim [to the United States'] protection" and places the Tribe "under [the United States'] protection."  In Article 5 of the 1825 Treaty, the Tribe relinquishes its right to exact revenge or retaliation on non-Indian wrongdoers who commit certain crimes against Indians; in exchange, upon the Chiefs delivering up said wrongdoers, the United States promises to try and punish the non-Indian wrongdoers as if their crimes had been committed against white men.  1825 Treaty, supra, art. 5.

In the Tribe's view, this "was one of the earliest federal commitments to impose U.S. criminal law in Oglala territory, and to provide basic federal law enforcement services in Oglala territory."  Doc. 24 ¶ 28.  Defendants point to the language in Article 5 that places the "duty . . . to deliver up the person or persons, against whom the complaint is made" on the Indian "Chiefs," so that the offender "may be punished agreeably to the laws of the United States."  Doc. 35 at 45–46. Defendants argue that while "Article 5 afforded the United States the ability to enforce peace by

exercising criminal jurisdiction over non-Indian offenders and concurrent criminal jurisdiction over Indian offenders that commit crimes against non-Indians," that agreement was expressly "contingent upon *Tribal Chiefs apprehending and producing* the alleged offenders to the federal government." Doc. 35 at 45–46. Additionally, assuming for the sake of argument that the 1825 Treaty does impose some treaty duty, in the Defendants' view that duty is to exercise criminal jurisdiction on the Reservation, which the United States currently does through a somewhat complex scheme of federal statutes. Doc. 35 at 46; see also infra pp. 40–42, 54–56 (discussing criminal jurisdiction in Indian country).

The context around the signing of the 1825 Treaty suggests that the Tribe saw the 1825 Treaty as a political and economic alliance among equals rather than as an agreement providing for federal law enforcement in Lak̇ota territory. See Ostler, supra, at 32 (noting that signers of the 1825 Treaty "probably understood it not as an admission of U.S. sovereignty but as a friendly trade agreement between equals"). As to criminal jurisdiction, Article 5 of the 1825 Treaty itself provides that "it shall be the duty of said Chiefs, upon complaint being made as aforesaid, to deliver up the person or persons, against whom the complaint is made, to the end that he or they may be punished agreeably to the laws of the United States." 1825 Treaty, supra, art. 5. After the 1825 Treaty was concluded, the Tribe appears to have retained autonomy over its affairs, including law enforcement, and the United States did not enact legislation to fund law enforcement on the Tribe's lands on account of the 1825 Treaty. Given its historical context and language, the 1825 Treaty was not intended by its signatories to establish any significant federal law enforcement on the Tribe's lands.

Yet, the 1825 Treaty plainly obliges the United States to receive the Tribe "under their protection," and entitles the Tribe to "claim their protection."[21] In short, the 1825 Treaty between the Tribe and the United States signaled both parties' intentions that the friendship between the two sovereigns "should not be interrupted by the misconduct of individuals," that the United States would prosecute non-Indian criminal conduct occurring in tribal territory, and that the Tribe was under and entitled to the United States' protection.

### 3. 1851 Treaty

The westward expansion of the United States intensified significantly after the signing of the 1825 Treaty. The United States Army constructed several military forts along the Missouri River, white settlers and prospectors spread westward, and the newcomers disrupted tribal resources and hunting grounds. At the same time, many Great Plains tribes became increasingly involved in commercial trade with non-natives as steamboats ventured north on the Missouri River and provided a new mechanism for trade. The discovery of gold in California in 1849 exacerbated migration over native territories, and thousands of non-Indians traversing across tribal lands strained the federal government's relationship with tribes across the Northern Plains.[22]

---

[21] In 1825, as with all years preceding the Civil War, this country sometimes was called "these United States" and the pronoun "their" in this context refers to the United States. See Melissa M. Lee, Nan Zhang & Tilmann Herchenröder, From Pluribus to Unum? The Civil War and Imagined Sovereignty in Nineteenth-Century America, Am. Pol. Sci. Rev. 1, 6 (2023), https://www.cambridge.org/core/services/aop-cambridge-core/content/view/209A985C6BFB23E4B7B3E46FC22FF513/S0003055423000096a.pdf ("[A]t the beginning of the nineteenth-century Americans said 'the United States are,' by the end of the century they were much more likely to say 'the United States is.'").

[22] The Smithsonian National Museum of the American Indian has a useful study of the events leading up to the signing of the 1851 Treaty available online at Horse Creek Treaty: Case Study, Am. Indian Smithsonian Inst., https://americanindian.si.edu/nk360/plains-treaties-horse-creek/index.html#introduction (last visited May 16, 2023), as does Reinhardt, supra note 1, at 12. See also Catherine Price, The Oglala People 1841–1879: A Political History 31–37 (1996) (chronicling events leading up to signing of the 1851 Treaty).

The 1851 Treaty of Fort Laramie was signed on September 17, 1851.[23] The stated purpose

of the 1851 Treaty was to "establish[] and confirm[] peaceful relations" between the signatory

tribes and the United States.  The Supreme Court of the United States discussed the purposes of

the 1851 Treaty briefly in Montana v. United States:

> The purposes of the 1851 treaty were to assure safe passage for settlers across the
> lands of various Indian Tribes; to compensate the Tribes for the loss of buffalo,
> other game animals, timber, and forage; to delineate tribal boundaries; to promote
> intertribal peace; and to establish a way of identifying Indians who committed
> depredations against non-Indians.

450 U.S. 544, 557–58 (1981).  The 1851 Treaty "chiefly represented a covenant among several

tribes which recognized specific boundaries for their respective territories." Id. at 553.

The Tribe specifically points to Articles 2 and 3 of the 1851 Treaty as sources for the

federal government's law enforcement duty on the Reservation:

### Article 2

> The aforesaid nations do hereby recognize the right of the United States
> Government to establish roads, military and other posts, within their respective
> territories.

### Article 3

> In consideration of the rights and privileges acknowledged in the preceding article,
> *the United States bind themselves to protect the aforesaid Indian nations against*
> *the commission of all depredations by the people of the said United States . . . .*

---

[23] The 1851 Treaty can be found in 2 Charles J. Kappler, Indian Affairs: Laws and Treaties, S.
Doc. No. 719-194, at 594–596 (3d Sess. 1904), https://www.govinfo.gov/content/pkg/GOVPUB-
Y4_IN2_11-1c227893bfbe1da6dd96b6883fd0205b/pdf/GOVPUB-Y4_IN2_11-
1c227893bfbe1da6dd96b6883fd0205b.pdf.  11 Stat. 749 is commonly and incorrectly used to
reference language from the 1851 Treaty, but the text of the treaty is not actually printed in the
1859 Statutes at Large.  See Charles D. Bernholz, Citation Abuse and Legal Writing: A Note on
the Treaty of Fort Laramie with Sioux, etc., 1851 and 11 Stat. 749, 29 Legal Reference Servs. Q.
133,                                    134                                    (2010),
https://digitalcommons.unl.edu/cgi/viewcontent.cgi?article=1260&context=libraryscience.    The
1851 Treaty is also known as the "Horse Creek Treaty."

2 Kappler, supra note 23, at 594 (emphasis added).  The Tribe views Article 3 as the federal government's second treaty promise to provide the Oglalas with law enforcement protection, Doc. 24 ¶ 30.  Conversely, Defendants read Article 3 of the 1851 Treaty much like they view Article 2 of the 1825 Treaty, insisting that it provides merely a "broad grant of general protection" that is "insufficient to establish the specific trust duties for law enforcement that Plaintiff alleges."  Doc. 35 at 46–47.

Textually, Article 3 of the 1851 Treaty binds the United States "to protect the aforesaid Indian nations against the commission of all depredations by the people of the said United States," which at the time likely was understood to mean non-Indians traversing through or otherwise within tribal territory; in 1851, the treaty term "people of the said United States" likely was not understood to encompass Native Americans, who did not receive full citizenship rights until much later with the passage of the Snyder Act in 1921.  But from the Native American perspective and indeed likely from that of the United States at the time, the tribes' grant of the right for government roads and military posts in tribal lands was in exchange for the government genuinely protecting "the aforesaid Indian nations against the commission of all depredations by the people of the said United States."  That is, under Article 3 of the 1851 Treaty, the United States committed to protect the signatory tribes against criminal acts perpetrated by non-Indians.  Article 4 obligates the tribes "to make restitution or satisfaction for wrongs committed" by tribal members "on the people of the United States . . . *lawfully* residing in or passing through" tribal territory—a relinquishment of sovereignty signaling the tribes expected some form of law enforcement cooperation from the United States.  2 Kappler, supra note 23, at 594.

Courts on several occasions have interpreted provisions of the 1851 Treaty, albeit in different circumstances than what is presented here.  The tribes in Gros Ventre Tribe v. United

States, for example, sued the United States alleging that the government had violated specific and general trust obligations to protect tribal trust resources by authorizing and planning to expand two gold mines that were located upriver from the tribes' reservation.  469 F.3d 801, 803 (9th Cir. 2006).  The United States Court of Appeals for the Ninth Circuit held, however, that "none of the treaties cited by the Tribes impose[d] a specific duty on the United States to regulate third parties or non-tribal resources for the benefit of the Tribes."  Id.  The Ninth Circuit reasoned that the 1851 Treaty did not impose on the United States "specific fiduciary obligations in the management of water resources existing off of the Reservation."  Id. at 812.  Rather, the 1851 Treaty "merely recognize[d] a general or limited trust obligation to protect the Indians against depredations on Reservation lands."  Id.  "[F]acial compliance with statutory and regulatory requirements" was all that was required of the federal government in Gros Ventre, because there was no promise by the United States to manage off-reservation water resources for the benefit of the tribe in either the 1851 Treaty or any of the other treaties cited by the tribes.  Id.  Gros Ventre did not foreclose the possibility that the 1851 Treaty, while not requiring the United States to manage non-tribal resources, may nonetheless provide other law enforcement duties based on the United States' obligation "to protect the Tribes from depredations that occurred only on tribal land."  Id. at 813.

The Defendants also cite Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers for the proposition that the 1851 Treaty did not impose *any* specific fiduciary duties on the United States.  Doc. 35 at 47.  In Standing Rock, the tribes argued that the Army Corps of Engineers' decision to grant an easement for the construction and operation of an oil pipeline violated the government's trust obligations to protect treaty rights and resources.  255 F. Supp. 3d 101, 143–45, 155 (D.D.C. 2017).  The court held in part that neither the general trust relationship, 1851 Treaty, nor the 1868 Treaty established a specific fiduciary or other duty that the tribes could show

was violated by the decision to authorize the oil pipeline.  Id.  As in Gros Ventre, the tribes in Standing Rock lost because they failed to point to a "specific statute, treaty, executive order, or other provision that gives rise to specific fiduciary duties." Id. at 144.  But Standing Rock likewise did not hold that the 1851 Treaty could never be read to impose a specific fiduciary duty on the United States.

Article 3 of the 1851 Treaty bound the United States "to protect the aforesaid Indian nations against the commission of all depredations by the people of the United States[.]"  Article 4 of the Treaty committed the tribes to make restitution for wrongs of Indians to non-Indians lawfully on tribal lands.  Thus the 1851 Treaty, when viewed in the larger historical context discussed throughout this opinion and order, reasonably can be read to commit the United States to cooperation in law enforcement with the Tribe and to assuring proper law enforcement against non-Indians on the Tribe's Reservation.

### 4. 1868 Treaty

Whatever relative stability the 1851 Treaty brought to the Great Plains did not last long, as travel through the area by white settlers intensified and caused conflict with the tribes.  In March 1865, near the end of the Civil War and after a series of conflicts between the United States military and various Great Plains tribes, particularly bands of the Laḳota, Congress commissioned a study of Indian affairs throughout the country.  The results of that study—compiled into what is known as the "Doolittle Report"—found that much of the hostilities by tribes out west could be traced to the "aggressions of lawless white men."  Joint Special Comm. Appointed Under Joint Resolution of March 3, 1865, Conditions of the Indian Tribes, S. Rep. No. 39-136 (1867).  Congress eventually formed a commission to travel to tribal territory with several key goals: to bring peace to the region, secure overland transportation routes, and eventually persuade the tribes to forego their traditional culture and concentrate on limited reservations of land where they would be

expected to support themselves by living how the federal government believed they ought to live. See Act of July 20, 1867, 15 Stat. 17 ("An Act To establish Peace with certain Hostile Indian Tribes"); Kerry R. Oman, The Beginning of the End The Indian Peace Commission of 1867–1868, 22 Great Plains Q. 35, 36–37 (2002); Cohen, supra note 1, § 1.03; Harry Kelsey, The Doolittle Report of 1867: Its Preparation and Shortcomings, 17 J. Sw. 107, 111–20 (1975).  While attitudes towards Indian affairs varied in Congress at the time, in the aftermath of a long and bloody Civil War, the United States government unsurprisingly sought to make peace with the tribes rather than war.[24]

The 1868 Treaty of Fort Laramie between the United States and the Great Sioux Nation is considered to have been executed on April 29, 1868.[25]  See 1868 Treaty, supra note 25.  Out of the three treaties cited by the Tribe in this case, the 1868 Treaty has generated the most discussion in case law.  See Barbra J. Van Arsdale, Construction and Application of Fort Laramie Treaty of 1868, Apr. 29, 1868, 15 Stat. 635, 59 A.L.R. Fed. 2d 243 (2011) (collecting and discussing all cases that have construed and applied the 1868 Treaty).  In part, the 1868 Treaty "was entered into

---

[24] The Smithsonian National Museum of the American Indian has a useful study of the events leading up to the signing of the 1868 Treaty, available online at Fort Laramie Treaty: Case Study, Am. Indian Smithsonian Inst., https://americanindian.si.edu/nk360/plains-treaties-fort-laramie/ (last visited May 16, 2023).

[25] The commonly used April 29, 1868, date is a bit misleading, as the 1868 Treaty was actually signed by the various tribal bands over the course of several months.  See Oman, supra, at 43–46. The famous Oglala Laḳota leader Maȟpíya Lúta (Red Cloud) did not sign the 1868 Treaty until the peace commission had already dissolved.  Id. at 46.  The Senate advised ratification of the 1868 Treaty on February 16, 1869, and President Andrew Johnson formally proclaimed the 1868 Treaty eight days later.   Treaty with the Sioux—Brule, Oglala, Minconjou, Yanktonai, Hunkpapa, Blackfeet, Cuthead, Two Kettle, Sans Arcs, and Santee—and Arapaho, 1868, Apr. 29, 1868, 15 Stat. 635 n.A [hereinafter 1868 Treaty].  It is difficult to briefly summarize the 1868 Treaty timeline with accuracy, because as discussed supra note 1, the tribes of the Great Plains have been lumped together as the "Sioux" in much of the cases discussing the 1868 Treaty, but the paths the various bands took to reservation life was far more nuanced and complex.  There is no doubt, however, that the Oglala Sioux Tribe as it is recognized today is a beneficiary of and party to the 1868 Treaty, whenever and however its people's assent may have been considered final.

with the hopes of officially ending hostility between the Sioux tribes and the United States following the Powder River War of 1866–1867."[26] Jewell, 205 F. Supp. 3d at 1062 (citing United States v. Sioux Nation of Indians, 448 U.S. 371, 374 (1980)).  The Powder River War was "a series of military engagements in which the Sioux tribes, led by their great chief, Red Cloud, fought to protect the integrity of earlier-recognized treaty lands from the incursion of white settlers." Sioux Nation, 448 U.S. at 374.  Among other things, the 1868 Treaty "established the Great Sioux Reservation . . . in addition to certain reservations already existing east of the Missouri," id. at 374–75, and at least "temporarily put an end to fighting between the United States and party tribes in the Great Plains," Rosebud Sioux Tribe, 9 F.4th at 1020.

The Tribe relies heavily on Article 1 of the 1868 Treaty, which begins: "From this day forward all war between the parties to this agreement shall forever cease.  The Government of the United States desires peace, and its honor is hereby pledged to keep it.  The Indians desire peace, and they now pledge their honor to maintain it."  Article 1 then contains what has come to be known as the "Bad Men Clauses"[27]:

[First Bad Men Clause]

If bad men among the whites, or among other people subject to the authority of the United States, shall commit any wrong upon the person or property of the Indians, the United States will, upon proof made to the agent and forwarded to the Commissioner of Indian Affairs at Washington City, proceed at once to cause the offender to be arrested and punished according to the laws of the United States, and also re-imburse the injured person for the loss sustained.

[Second Bad Men Clause]

---

[26] For a deeper discussion of the historical events leading up to and following the formal ratification of the 1868 Treaty, see Paul L. Hedren, Powder River: Disastrous Opening of the Great Sioux War 3–41 (2016).

[27] Sometimes these are called "bad *man*" rather than "bad *men*" clauses.  See Hebah v. United States, 428 F. 2d 1334 (Cl. Ct. 1970); Note, A Bad Man is Hard to Find, 127 Harv. L. Rev. 2521 (2014).  This Court prefers to use "Bad Men Clauses" as that parallels the treaty text.

> If bad men among the Indians shall commit a wrong or depredation upon the person or property of any one, white, black, or Indian, subject to the authority of the United States, and at peace therewith, the Indians herein named solemnly agree that they will, upon proof made to their agent and notice by him, deliver up the wrong-doer to the United States, to be tried and punished according to its laws; and in case they wilfully refuse so to do, the person injured shall be re-imbursed for his loss from the annuities or other moneys due or to become due to them under this or other treaties made with the United States.

Article 5 of the 1868 Treaty further addresses the federal government's law enforcement role on the Reservation:

> The United States agrees that the agent for said Indians shall in the future make his home at the agency-building; that he shall reside among them, and keep an office open at all times for the purpose of prompt and diligent inquiry into such matters of complaint by and against the Indians as may be presented for investigation under the provisions of their treaty stipulations, as also for the faithful discharge of other duties enjoined on him by law. In all cases of depredation on person or property he shall cause the evidence to be taken in writing and forwarded, together with his findings, to the Commissioner of Indian Affairs, whose decision, subject to the revision of the Secretary of the Interior, shall be binding on the parties to this treaty.

In the Tribe's view, the Bad Men Clauses were a quid pro quo of sorts. Pointing to Article 11 of the 1868 Treaty, in which the Tribe made its promises "in consideration of the advantages and benefits conferred by [the] Treaty," the Tribe argues it gave up its power of law enforcement on the Reservation in exchange for "the Tribe agree[ing] to cease hostilities and cede valuable sovereign authority." Doc. 25 at 23.

The text of the First Bad Men Clause in the 1868 Treaty contemplates several scenarios in which the "United States will . . . *cause the offender to be arrested and punished* according to the laws of the United States . . . ." 1868 Treaty, supra note 25, art. 1. The First Bad Men Clause puts law enforcement responsibility on the United States where bad men among the whites or other people subject to the authority of the United States commit any wrong[28] upon the person or

---

[28] In Richard v. United States, while declining to resolve the issue in the first instance, the United States Court of Appeals for the Federal Circuit passingly considered what constitutes a "wrong"

35

property of tribe-member Indians.[29]  This aligns with the Tribe's desire in 1868 to secure peace in

tribal lands across the Great Sioux Reservation and preserve tribal members' way of life.  In short,

the tribes wanted to be left alone to the extent possible and deal with the wrongful conduct of the

white man as little as possible.  Thus, it makes sense that the Tribe would expect the United States

to assume responsibility, or at least provide support, for policing non-tribal members who entered

the Reservation and committed wrongs on tribal members or their property.

The requirement in the Second Bad Men Clause that the Tribe deliver to the United States

tribal members who committed wrongs on non-tribal members[30] (or forsake annuities payable to

the Tribe) was a relinquishment of some tribal power to police its own members, extending beyond

provisions in the 1825 Treaty and 1851 Treaty.  The Tribe's concession of authority and agreement

to turn over tribal members to a federal agent suggests that the Tribe was not undertaking exclusive

responsibility for law enforcement on the Reservation; the Tribe would have expected in return at

least some support from the United States in handling reservation crimes committed by its

---

under the Bad Men Clauses, commenting that "because the [1868] Treaty determines offenders
are to 'be arrested and punished according to the laws of the United States,' 'wrongs' seem to be
limited to the criminal jurisdiction of the United States."  677 F.3d 1141, 1153 n.22 (Fed. Cir.
2012).  The United States Court of Federal Claims has signaled that "wrongs" "include[]
affirmative criminal acts and not mere acts of negligence."  Hernandez v. United States, 93 Fed.
Cl. 193, 199 (2010).  But thus far there seems to be no widely accepted definition of the word
"wrong" under the Bad Men Clauses.  See A Bad Man is Hard to Find, supra note 27, at 2533
(noting that "[n]o case has definitively established the meaning of 'wrong'" under the Bad Men
Clauses); see also Hernandez, 93 Fed. Cl. at 199 ("The term 'wrongful act' was not defined
explicitly by the Fort Laramie Treaty or in judicial decisions, so the court must seek to determine
what the parties to the Fort Laramie Treaty intended this term to mean.").  The sort of "wrongs"
contemplated by the Bad Men Clauses at the very least include violations of criminal law.
[29] The First Bad Man Clause does not explicitly say "any wrong upon the person or property of
tribal member" Indians but when the two Bad Men Clauses are read together and in context that
interpretation is easily inferred.  See infra pp. 38–40 (discussing Ex parte Kan-gi-shun-ca (Crow
Dog), 109 U.S. 556 (1883)); see also infra pp. 40–41 (discussing federal circuit cases).
[30] Again, "non-tribal" is not in the text of the Second Bad Men Clause but the Supreme Court said
as much in Ex Parte Crow Dog, infra pp. 38–40.

members. This interpretation is further buttressed by Article 5 of the 1868 Treaty, in which the United States agreed to "keep an office open at all times for the purpose of prompt and diligent inquiry into such matters of complaint *by and against the Indians* as may be presented for investigation." (emphasis added). Notably, Article 5 of the 1868 Treaty further provides that the United States shall "[i]n *all cases* of depredation on person or property . . . cause the evidence to be taken in writing and forwarded" to the Commissioner of Indian Affairs, suggesting there would be United States involvement beyond simply exercising criminal jurisdiction in situations arising under not just the First Bad Men Clause, but the Second Bad Men Clause as well; after all, it is only the Second Bad Men Clause that references "depredations" on person or property. 1868 Treaty, supra note 25, art. 5 (emphasis added).

Put simply, the plain language of the 1868 Treaty vests the United States government with some responsibility for law enforcement on the Tribe's Reservation. The language of the 1868 Treaty is somewhat ambiguous about the extent of federal responsibility for law enforcement on the Reservation, but not so ambiguous to negate finding a treaty-based duty. Under the canons of construction that apply to treaties with tribes, ambiguities are construed in favor of the Tribe. Oneida Indian Nation, 470 U.S. at 247. The 1868 Treaty is sufficiently clear to establish that the government has a treaty-based duty to arrest and prosecute crimes by non-tribal members on the Tribe's lands against the person or property of tribal members under the First Bad Men Clause, to cooperate with the Tribe to try and punish those delivered up by the Tribe under the Second Bad Men Clause, and to at the very least "keep an office open at all times" on the Reservation for prompt and diligent inquiry into criminal matters on the Reservation under Article 5.

This Court's analysis of the 1868 Treaty and the United States' obligations under the Bad Men Clauses and Article 5 dovetails with the little precedent there is on the subject. The Supreme

Court considered the 1868 Treaty for the first time in <u>Ex parte Kan-gi-shun-ca (Crow Dog)</u>, 109

U.S. 556 (1883).  On August 5, 1881, Kȟaŋǧí Šúŋka (Crow Dog) shot and killed Tribal Chief Siŋté

Gléška (Spotted Tail)[31] just outside the Rosebud Indian Agency on the Great Sioux Reservation

after a long running feud between the two tribal members.  Following the killing, Spotted Tail and

Crow Dog's families followed tribal custom, and Crow Dog and his family paid restitution to

Spotted Tail's family; so the tribe considered the matter settled.

Many non-Indians were outraged by the tribe's handling of Spotted Tail's killing, which

led to Crow Dog being charged, convicted, and sentenced to death for the murder of Spotted Tail

in United States District Court for the Territory of Dakota.  <u>Crow Dog</u>, 109 U.S. at 557.  In other

words, the United States government for perhaps the first time asserted jurisdiction over a crime

committed by a tribal member on another tribal member of the same tribe, on reservation land.  <u>Id.</u>

Crow Dog appealed his conviction to the Supreme Court on the grounds that the United States

lacked criminal jurisdiction over his killing of Spotted Tail.  <u>Id.</u> at 562.

On appeal, Crow Dog pointed to a federal statute—The Indian Country Crimes Act or

"General Crimes Act"—that excepted from federal criminal jurisdiction crimes committed by one

Indian against the person of another Indian in Indian country.  <u>Id.</u> at 557–58.  The United States,

however, argued that the 1868 Treaty and the 1877 Act (to be discussed below) had effectively

repealed that exception in two distinct ways.  <u>Id.</u> at 567–69.  First, the United States argued that

the Second Bad Men Clause of the 1868 Treaty—which provided that if an Indian offender

commits a wrong against anyone subject to the authority of the United States, including another

---

[31] Spotted Tail signed the 1868 Treaty and remains revered among his people's descendants, the Sičaŋǧu ("Burnt Thigh"), commonly called the Rosebud Sioux Tribe, which has named its Sinte Gleska University after him.  The Rosebud Indian Reservation is to the east of the Pine Ridge Reservation, and both reservations are on lands previously set aside under the 1868 Treaty as the Great Sioux Indian Reservation.

Indian, the Indians would deliver the accused to the United States to be tried under United States law—created federal criminal jurisdiction over Indian-on-Indian crime, even if the accused and the victim were members of the same tribe. Id. at 567. The Supreme Court reasoned that the provision that required the Indians to pay compensation to the victim in cases where they refuse to deliver the accused to the United States "point[ed] quite distinctly to the conclusion that the injured person *cannot himself be one of the same tribe*." Id. at 568 (emphasis added).

Second, the United States argued that the 1877 Act, in which Congress declared it would secure to the Indians "an orderly government" and protect them in their rights of "property, person, and life," conferred criminal jurisdiction to the federal government over intra-tribal crime in Indian country. Id. The Supreme Court likewise rejected this argument, holding that in contracting with the tribes, the United States treated them as a distinct political body and sought to secure the tribe's power over their own laws and customs. Id. The Court also declared (in undeniably racist language that this Court will not quote in full here) that despite the federal government's intent to respect the sovereignty of the tribes, the tribes would "nevertheless . . . be subject to the laws of the United States, not in the sense of citizens, but, as they had always been, as wards, subject to a guardian." Id. at 568–69.

The Court in Ex Parte Crow Dog further reasoned that the statute excepting certain Indian-on-Indian crimes from federal criminal jurisdiction applied to the tribes. Id. at 569. In other words, according to the Court, rather than repealing the exception regarding Indian-on-Indian crime, the 1868 Treaty reinforced its application. In the Supreme Court's view, the "obligation of protection" set out in the 1877 Act was

> immediately connected with . . . the declaration that each individual shall be protected in his rights of property, person, and life, and that obligation was to be fulfilled by the enforcement of the laws then existing appropriate to those objects,

and by that future appropriate legislation which was promised to secure to them an orderly government.

Id.

Ex Parte Crow Dog prompted Congress in 1885 to enact the Major Crimes Act, overruling the decision, which now extends federal court criminal jurisdiction over more than 30 listed felony offenses when committed by an Indian against the person or property of another Indian in Indian country.  Cohen, supra note 1, § 9.02[2] (discussing how Congress enacted the original version of the Indian Major Crimes Act in 1885, in response to the Supreme Court's decision in Ex Parte Crow Dog); 18 U.S.C. § 1153.  The constitutionality of the Major Crimes Act has been upheld by the Supreme Court numerous times.  See e.g., United States v. Kagama, 118 U.S. 375, 385 (1886); Negonsott v. Samuels, 507 U.S. 99, 103 (1993); Lone Wolf v. Hitchcock, 187 U.S. 553, 566–67 (1903); United States v. Thomas, 151 U.S. 577, 585 (1894); United States v. Antelope, 430 U.S. 641, 648 (1977).  The Supreme Court's analysis of the 1868 Treaty and 1877 Act in Ex Parte Crow Dog nonetheless remains as precedent, but the Supreme Court only addressed those sources in limited fashion.  Thus, while Ex Parte Crow Dog is controlling and instructive on the Tribe's claim of a treaty duty, it did not settle exactly what law enforcement duty the United States owes the signatory tribes under the 1868 Treaty.

The Bad Men Clauses have also been discussed in a series of cases in the United States Court of Federal Claims and Court of Appeals for the Federal Circuit, where Indian plaintiffs sought reimbursement from the federal government under the First Bad Men Clause for wrongs committed against them by "whites" and "other people subject to the authority of the United States."  See, e.g., Richard v. United States, 677 F.3d 1141, 1153 (Fed. Cir. 2012) (concluding that "bad men" in the First Bad Men Clause is not limited to government actors); Tsosie v. United States, 825 F.2d 393, 400 (Fed. Cir. 1987) (concluding that "white" can be a "bad man," plus any

nonwhite "subject to the authority of the United States" which most likely included non-member Indians); <u>Elk v. United States</u>, 87 Fed. Cl. 70, 80–81 (2009); <u>see also</u> <u>A Bad Man is Hard to Find</u>, <u>supra</u> note 27, at 2528.  But none of those cases expressly dealt with what duty the 1868 Treaty created on the part of the United States to provide law enforcement on the Reservation.

Criminal defendants have creatively attempted, albeit unsuccessfully, to invoke the Second Bad Men Clause to contest the government's assertion of federal criminal jurisdiction in Indian Country.  For example, in <u>United States v. Drapeau</u>, 414 F.3d 869 (8th Cir. 2005), the defendant argued that the Second Bad Men Clause imposed a notice and request obligation on the United States, which he argued federal agents had failed to satisfy before they exercised jurisdiction over him.  <u>Id.</u> at 878.  The Eighth Circuit was unconvinced:

> The plain language of the treaty, moreover, does not create the sort of "notice" requirement that Drapeau envisions.  The treaty does not say that the United States must give notice to an Indian tribe before the government may arrest and prosecute a tribal member who has violated the federal drug trafficking laws.  Rather, the treaty imposes *an obligation on the tribe* to "deliver up the wrong-doer to the United States," upon proof and notice to the tribe.

<u>Id.</u>

Before <u>Drapeau</u>, some 65 individuals who had been criminally charged for acts committed during the clash at Wounded Knee in 1973 moved to have their cases dismissed, arguing that "the Courts of the United States do not have the power and jurisdiction to judge the guilt or innocence of individuals who are citizens of other Nations for alleged crimes committed on the soil of other Nations."  <u>United States v. Consol. Wounded Knee Cases</u>, 389 F. Supp. 235, 236 (D. Neb. 1975), <u>opinion adopted sub nom.</u>, <u>United States v. Dodge</u>, 538 F.2d 770 (8th Cir. 1976).  The district court held that while the Second Bad Men Clause can be read to exclude from United States criminal jurisdiction "an Indian member of a signatory tribe committing a crime against another member of a signatory tribe," subsequent Congressional acts have in essence abrogated any such

reading of that language.  Id. at 242–44.  Given the circumstances of that case, it is unsurprising that the district court found it necessary to expound on the history and meaning of the 1868 Treaty; ultimately, however, the court's exercise of criminal jurisdiction was premised on federal statutes passed after the 1868 Treaty was signed.  The district court's statement that "[w]hat the Sioux principally and naturally were interested in at the time of the signing of the treaty, as far as it touched government, was a leaving undiminished of their authority to punish their own," while true, does not define what law enforcement duty the United States bears under the 1868 Treaty. Id. at 242.

In sum, the 1868 Treaty under the First Bad Men Clause placed on the government the duty to arrest and prosecute non-tribal members for crimes on tribal lands against the person or property of tribal members, and under Article 5 the duty to keep an office open for "prompt and diligent inquiry" into criminal complaints "*by and against* the Indians."  1868 Treaty, supra note 25, art. 5 (emphasis added).  Ex Parte Crow Dog and other cases confine the Second Bad Men Clause to obliging the United States to cooperate with the Tribe in law enforcement for crimes tribal members commit on the Reservation that implicate federal concerns, which in 1868 was tribal member crime on non-Indians and non-tribal member Indians.  Each of these provisions can be read as refining and defining the more general commitments of the United States under the 1851 Treaty "to protect the aforesaid Indian nations against the commission of all depredations by the [non-Indian] people of said United States" and under the 1825 Treaty to provide the United States' "protection" of tribal members.

### 5.  *End of Treaty Making, Appropriations Acts and Start Statutory Era*

The 1868 Treaty was one of the last formal treaties between the United States and tribes. Congress formally ended the practice of treaty-making with Indian tribes in March 1871, while at the same time validating those treaties already in existence:

*Provided*, That hereafter no Indian nation or tribe within the territory of the United States shall be acknowledged or recognized as an independent nation, tribe, or power with whom the United States may contract by treaty: *Provided, further*, That nothing herein contained shall be construed to invalidate or impair the obligation of any treaty heretofore lawfully made and ratified with any such Indian nation or tribe.

Act of Mar. 3, 1871, ch. 120, 16 Stat. 544, 566; see also United States v. Lara, 541 U.S. 193, 201 (noting that the 1871 Act saved "existing treaties from being 'invalidated or impaired," but did not affect "Congress' plenary powers to legislate on problems of Indians" (citation omitted)). The end of the treaty-making era did not signal an end to the federal government's practice of making agreements with the tribes; the shift simply meant that agreements with the tribes would require the approval of both houses of Congress, and "the federal-Indian relationship continued to develop outside the federal legislature by way of executive orders." Cohen, supra note 1, § 1.03[9]. The end of the treaty-making era coincided with a shift in the prevailing governmental attitudes toward Indian affairs.

The 1868 Treaty brought only short-lived stability and peace to the Great Plains region, as speculation for gold in the Black Hills quickly destabilized the United States' relations with the tribes yet again. The Black Hills, known to the Laḳota people as Paha Sapa, is a scenic mountain range covering nearly two million acres across western South Dakota and extending into eastern Wyoming. Before the 1870s, many non-Indians thought of Laḳota lands in the Great Plains merely as "a region on the way to someplace else," while others were convinced that the kind of gold rush that had already consumed California, Colorado, and Montana would eventually reach the Black Hills. Ostler, supra, at 58. At least initially, the United States honored the 1868 Treaty by deterring prospectors from the Black Hills. But lust for gold escalated with the economic panic of 1873, and social and political pressures eventually led to authorization of Lieutenant Colonel George Armstrong Custer's infamous expedition into the Black Hills in 1874, which at that time was

closed to non-Indian settlement.  News that the expedition had found gold quickly prompted calls for the "opening" of the Black Hills to non-Indian settlement.  Prospectors disregarded that the Black Hills were not "open" for settlement under the 1868 Treaty, reigniting conflict with tribes and leading the United States to reverse its policy of respecting tribal land boundaries.  Over the next few decades, this policy reversal resulted in losses of large parts of the Great Sioux Indian Reservation that had been established under the 1868 Treaty.  The tribes who signed the 1868 Treaty ended up being pushed onto those portions of the Great Sioux Reservation that were least desirable for agriculture and ranching.  See generally id. at 56.

To many modern Laḳota people, the Black Hills is the sacred center of the world, integral to Laḳota traditional spiritual practices, and part of the lands the Laḳota negotiated to preserve as exclusively their own in the 1868 Treaty.  Noem, 542 F. Supp. 3d at 906; see also Dee Brown, Bury My Heart at Wounded Knee 276 (1970) ("Paha Sapa, the Black Hills, was the center of the world, the place of gods and holy mountains, where warriors went to speak with the Great Spirit and await visions.").  To be sure, in the eyes of many non-Indians, Custer's expedition was a tremendous success from the moment newspapers reported the expedition had found gold.  And today the Black Hills is the premier destination driving South Dakota's tourism industry, which employs some 50,000 South Dakotans and is the second largest industry next to agriculture in the state.  Noem, 542 F. Supp.3d at 906.  It is also true that the expedition led to dispossession of the Black Hills from the Laḳota, which 90 years later prompted the Supreme Court of the United States to observe: "A more ripe and rank case of dishonorable dealings will never, in all probability, be found in our history . . . ."  Sioux Nation, 448 U.S. at 388 (citation omitted).

Faced with fresh conflict in and around the Reservation driven by renewed speculation for gold in the Black Hills, the opening of the Black Hills to white settlement contrary to the 1868

Treaty, and an increasing dissatisfaction in Congress that the tribes had not adapted well to the reservation lifestyle that had been thrust upon them just a few years earlier, President Ulysses S. Grant sent another commission to meet with the tribes to get land concessions. Sioux Nation, 448 U.S. at 376–81. As Brown, supra, at 279, writes: "In other words, the time had come to take away one more piece of territory that had been assigned to the Indians in perpetuity." The commission arrived with the text of an "agreement" already in hand and capitalized on the tribes' starvation and desperation to extract valuable concessions while giving little in return. Sioux Nation, 448 U.S. at 381–82. Native Americans have long contested that they voluntarily ceded the Black Hills, and after decades of litigation, the Supreme Court determined that the Black Hills had been wrongfully taken from the tribes without compensation. Id. at 423–24.

In 1877, Congress passed an appropriations act with the stated purpose of "ratify[ing]" the "agreement" with the Sioux tribes. Act of Feb. 28, 1877, 19 Stat. 254.[32] Among other things, the 1877 Act "had the effect of abrogating [certain provisions of the 1868 Treaty], and of

---

[32] Defendants argue that the 1877 Act "does *not* mention the treaties at issue in this litigation" but instead references "a *different* treaty . . . between the United States and the Northern Cheyenne and Northern Arapaho Tribes of Indians," which in their view "is entirely unrelated to this case." Doc. 35 at 52. Defendants rely on the margin note to Article 8 of the 1877 Act, which reads "Treaty of 1868, 15 Stat., 655. In Forco," which is the 1868 treaty with the Northern Cheyenne and Northern Arapaho. 19 Stat. at 256; Treaty with Northern Cheyenne and Northern Arapaho, 1868, May 10, 1868, 15 Stat. 655 [hereinafter Treaty with Northern Cheyenne and Northern Arapaho]. Defendants' argument is unconvincing for several reasons. The 1877 Act *does* reference the 1868 Treaty between the United States and the Sioux—in fact, the heading of the 1877 Act reads "An Act to ratify an agreement with certain bands of the Sioux Nation of Indians and also with the Northern Arapaho and Cheyenne Indians"—and discusses the 1868 Treaty throughout. See 19 Stat. 254. It makes sense that the 1877 Act would lump its discussion of these two treaties into the same section given the frequent alliances between bands of the Sioux and the Northern Cheyennes. Moreover, the treaty with the Northern Arapaho and Cheyenne has language that is almost identical to that in the 1868 Treaty with the Sioux, and the treaty with the Northern Arapaho and Cheyenne gave those tribes the option to "accept for their permanent home . . . some portion of the country and reservation set apart . . . for . . . bands of Sioux Indians [in the 1868 Treaty]." Treaty with Northern Cheyenne and Northern Arapaho, supra note 32, art. 2.

implementing the terms of the . . . 'agreement' with the Sioux Leaders." <u>Sioux Nation</u>, 448 U.S. at 382–83.  In reality, as the Supreme Court noted, the 1877 Act was less about simply restating the 1868 Treaty than it was about "legitimiz[ing] the settlers' invasion of the Black Hills." <u>Id.</u> at 383.  It is difficult to overstate the extent of the land losses the tribes suffered under the 1877 Act. The 1877 Act removed over seven million acres from the Great Sioux Reservation, including the Black Hills, and in it "[t]he Indians also relinquished their rights to hunt in the unceded lands recognized by the [1868 Treaty], and agreed that three wagon roads could be cut through their reservation." <u>Id.</u> at 383 n.14.

Among other things, including providing "all necessary aid to assist the said Indians in the work of civilization," the 1877 Act pledged that in exchange for tribal concessions, Congress would, "by appropriate legislation, secure to them an orderly government" and that "each individual shall be protected in his rights of property, person, and life." 19 Stat. at 256.  The Indian law canons of construction apply to statutes as well, counseling that ambiguities are resolved to the tribes' benefit.  <u>Montana v. Blackfeet Tribe of Indians</u>, 471 U.S. 759, 766 (1985).  Taking this enactment's language on its face and considering that the act removed millions of acres of tribal land from the Great Sioux Reservation, the United States committed that tribal members "shall be protected in [their] rights of property, person, and life." 19 Stat. at 256.  The Act also stated that the provisions of the 1868 Treaty that had been unmodified would continue in full force.  Doc. 24 ¶ 42.  The 1877 Act did not remove or amend the Bad Men Clauses or Article 5 of the 1868 Treaty and enlarged the United States' responsibility for protection of tribal members.

In 1878, Congress passed an appropriations act ("1878 Act") funding the various obligations set out in the 1868 Treaty, as well as the additional commitments the 1877 Act made to the tribes.  Act of May 27, 1878, ch. 142, 20 Stat. 63.  Under the section labeled, "Sioux of

Different Tribes, Including Santee Sioux of Nebraska," the 1878 Act appropriated monies for several different purposes and in its margins referenced the specific treaty and statutory commitments the appropriations were meant to fulfill. 20 Stat. at 80. For example, citing 15 Stat. 638 (where the ratified text of Article 10 of the 1868 Treaty can be found), the 1878 Act appropriated $120,000 to purchase clothing the tribes were promised in Article 10 of the 1868 Treaty. 20 Stat. at 80. Citing the 1877 Act, the 1878 Act appropriated funds for "the subsistence of the Sioux . . . for purposes of their civilization," ostensibly in fulfillment of Article 5 of the 1877 Act where the "United States . . . agree[d] to provide all necessary aid to assist the . . . Indians in the work of civilization." 20 Stat. at 80 (citing 19 Stat. 254).

Notably, later in the 1878 Act, in a section titled "Miscellaneous," Congress appropriated funds for "Indian police":

> Pay of Indian Police: For the services of not exceeding four hundred and thirty privates at five dollars per month each, and not exceeding fifty officers at eight dollars per month each, of Indian police, *to be employed in maintaining order and prohibiting illegal traffic in liquor on the several Indian reservations*, thirty thousand dollars: *Provided,* That Indians employed at agencies in any capacity shall not be construed as part of agency employees named in section five of the net making appropriations for the Indian service . . . .

20 Stat. at 86 (emphasis added). Throughout the 1878 Act, funds are appropriated for numerous tribes across United States; the Act was not solely about funding the government's treaty and statutory obligations to the Sioux. The funds appropriated for an "Indian police" in the miscellaneous section of the 1878 Act were not just for providing police on the Sioux Reservation, but for providing police to "maintain[] order and prohibit[] illegal traffic in liquor on the *several Indian reservations.*" 20 Stat. at 86 (emphasis added).

The Pine Ridge Agency, which from 1878 onward became the principal reservation for the Oglalas within the Great Sioux Reservation, had a population of roughly seven to eight thousand

people in 1878 and received an enlistment allowance for 50 Indian policemen.  Mark R. Ellis,

Reservation *Akicitas*: The Pine Ridge Indian Police, 1879–1885, 29 S.D. Hist. 185, 187 (1999).[33]

While in one sense the Indian police force empowered the Tribe to retain control over law

enforcement within the Reservation, the level of control must be viewed in context.  Id. at 209

("The presence of tribal lawmen in early reservation society allowed the Oglalas to police

themselves rather than submit to government occupation troops . . . .").  The Tribe's police force

after the 1878 Act was funded with federal dollars and served at the direction of a federal agent,

at a time when the overriding goal of the United States government was to assimilate and "civilize"

the Indian tribes.  Cohen, supra note 1, § 1.04 ("The theme of Indian policy for the remainder of

the nineteenth and first quarter of the twentieth century was "civilization and assimilation.""); Carl

G. Hakansson, Allotment at Pine Ridge Reservation: Its Consequences and Alternative Remedies,

73 N.D. L. Rev. 231, 238 (1997) (discussing assimilationist policies on the Reservation in the late

nineteenth century).  The Pine Ridge Indian police had responsibilities beyond just enforcing tribal

law among their own members.  Tribal police maintained order across the Reservation, including

by arresting and dealing with Indians, non-Indians, tribal members, and non-tribal members alike.

Ellis, supra, at 208.  Federal authorities also used the tribal police to keep out-of-state outlaws at

bay and to consolidate federal authority on the Reservation.[34]

---

[33] The Great Sioux Reservation was further diminished by an Act of Congress in 1889.  Act of Mar. 2, 1889, Ch. 405, 25 Stat. 888; United States ex rel. Cook v. Parkinson, 396 F. Supp. 473, 477 (D.S.D.), aff'd, 525 F.2d 120 (8th Cir. 1975).  That Act established what is now known as the Pine Ridge Indian Reservation and set its original boundaries.  The Pine Ridge Indian Reservation was further diminished in 1910.  Act of May 27, 1910, Ch. 257, 36 Stat. 440; United States ex rel. Cook, 525 F.2d at 124.

[34] According to at least one historian:

> One reason for authorizing as large a force as fifty men for Pine Ridge was that Nebraska lay along its southern boundary.  Just over the state line was a large Mexican settlement which [the federal agent] believed to be a "rendezvous for criminals and outlaws of all kinds."  Besides helping keep the reservation free of

Throughout the remainder of the nineteenth century, Congress regularly passed appropriations bills to fund the federal government's treaty and statutory obligations in Indian country, and the government continued to fund the Indian police on the Pine Ridge Reservation and other reservations.  See, e.g., Act of Dec. 2, 1889, 26 Stat. 336, 355 (1890 appropriations act renewing funding for Indian police); Act of May 31, 1900, 31 Stat. 221, 224 (1900 appropriations act renewing funding for Indian police); see also Hagan, supra note 34, at 43 (noting that by 1890 there were Indian police forces at virtually all Indian agencies).  In short, within nine to ten years of the 1868 Treaty, Congress was allocating funds and referencing the 1868 Treaty in parts of the appropriations, including federal funding for a police force on the Reservation.  That allowance in 1878 was sufficient to hire 50 police officers at a time where about 7,000 to 8,000 people lived on the Reservation.  Although the funding started ten years after the 1868 Treaty and included monies for law enforcement for non-signatory tribes, the amount of funding for law enforcement on the Reservation and the reference to the 1868 Treaty in appropriations points to Congress' understanding shortly after the 1868 Treaty that it bore a treaty-based duty to fund law enforcement on the Reservation.[35]

---

such undesirable elements, he hoped the police would furnish leverage against Red Cloud, the principal chief at Rosebud.

See William T. Hagan, Indian Police and Judges: Experiments in Acculturation and Control 90–01 (William H. Goetzmann, Archibald Hanna, Jr., Howard R. Lamar & Robin W. Winks eds., 1966).

[35] It should be noted, however, that from the very beginning of the Indian police force, inadequate pay for officers was an issue.  Hagan, supra note 34, at 43.  This does not completely foreclose that the United States has a law enforcement duty on the Reservation, but it does undermine the Tribe's argument for officer pay more commensurate with what police officers can earn with other police departments.

6. *More Recent Congressional Enactments Related to Tribal Law Enforcement*

In 1921, Congress passed the Snyder Act, which "provide[d] the underlying congressional authority for most BIA activities[,]" including funding for the Indian police. Morton v. Ruiz, 415 U.S. 199, 205–06 (1974). The Snyder Act also "requires the BIA to exercise an overriding duty of fairness when dealing with Indians." Blue Legs v. U.S. Bureau of Indian Affs., 867 F.2d 1094, 1100 (8th Cir. 1989). Before the Snyder Act was passed, there was technically no congressional authorization for BIA's activities, so "appropriation requests made by the House Committee on Indian Affairs were frequently stricken on the House floor by point-of-order objections." Morton, 415 U.S. 206. The Act, codified at 25 U.S.C. § 13, provides in part that the BIA, "under the supervision of the Secretary of the Interior, shall direct, supervise, and expend such moneys as Congress may from time to time appropriate, for the benefit, care, and assistance of the Indians throughout the United States." 25 U.S.C. § 13. Congress is authorized to appropriate money to the BIA for various purposes, including for "general support and civilization" and "[f]or the employment of . . . *Indian police*, Indian judges, and other employees." Id. (emphasis added). While the Snyder Act *authorizes* Congress to appropriate money for Indian affairs, it generally does not *on its own* impose a judicially enforceable duty on the federal government to actually make those appropriations. See generally Lincoln v. Vigil, 508 U.S. 182, 194 (1993) (noting Snyder Act only discusses Indian services in general terms); White Mountain Apache Tribe v. United States, 249 F.3d 1364, 1372 (Fed. Cir. 2001), aff'd and remanded, 537 U.S. 465 (2003) (holding general terms of Snyder Act do not require expenditure of general appropriations on specific Indian programs); Quechan Tribe of Ft. Yuma Indian Rsrv. v. United States, 599 F. App'x 698, 699 (9th Cir. 2015) (finding Snyder Act standing alone does not contain sufficient trust-creating language). Of course, lump sum appropriations for Indian services do not thereby absolve

50

the government of an otherwise recognizable treaty duty.  Rosebud Sioux Tribe v. United States, 450 F. Supp. 3d 986, 1001 (D.S.D. 2020), aff'd, 9 F.4th 1018 (8th Cir. 2021).

Federal Indian policy waffled from assimilation to tribal self-governance during the Franklin Roosevelt and Harry Truman administrations, to a renewed aggressive assimilation period of attempting to end federal government relations with tribes through tribal termination and Public Law 280 during the Dwight Eisenhower administration, and then back to a time of fostering tribal self-governance in later administrations.  See Erickson, 436 F. Supp. 3d at 1268–72; see also Richmond L. Crow, The Sioux in South Dakota History 1–7 (2007).  In 1975, Congress passed the Indian Self-Determination and Education Assistance Act so Indian tribes could assume greater control of federally administered educational and social programs.  ISDEAA declares Congress' commitment "to supporting and assisting Indian tribes in the development of strong and stable tribal governments, capable of administering quality programs and developing the economies of their respective communities."  25 U.S.C. § 5302(b).  Tribes are empowered by ISDEAA to enter into self-determination contracts with the United States to take control over certain programs previously administered by the federal government for the benefit of the Indians.  See 25 U.S.C. § 5321(a)(E).[36]  This Court discusses ISDEAA and 638 contracts at much greater length below when considering the Tribe's allegations based on ISDEAA in claims three through six of the amended complaint.

In 1990, Congress enacted the Indian Law Enforcement Reform Act.  Pub. L. No. 101-379, 104 Stat. 471 (codified at 25 U.S.C. §§ 2801–2815).  ILERA charges the Secretary of the Interior, acting through the BIA, with responsibility "for providing, or for assisting in the provision of, law

---

[36] These "[f]ederal services to Indians were never mere gratuities" but "were provided in exchange for cessions of land and rights."  Cohen, supra note 1, § 22.01.

enforcement services in Indian country " to the extent provided for in the Act. 25 U.S.C. § 2802(a).

ILERA "clarif[ies] and strengthen[s] the authority of the law enforcement personnel and functions

within the BIA." United States v. Schrader, 10 F.3d 1345, 1350 (8th Cir. 1993) (cleaned up and

citation omitted). Under ILERA, "the Secretary of Interior may charge BIA employees with a

broad range of law enforcement powers[,]" and in so doing "may contract with a tribe to assist

BIA in enforcing tribal laws and, in connection with such a contract, may authorize a tribal law

enforcement officer 'to perform any activity the Secretary may authorize under section 2803.'"

Id. (quoting 25 U.S.C. § 2804(a)).

Among other things, ILERA established the Office of Justice Services (OJS) within the

BIA and charged it with carrying out the Secretary's law enforcement duties in Indian country. 25

U.S.C. § 2802(b); see also Hopland Band of Pomo Indians v. Norton, 324 F. Supp. 2d 1067, 1072

(N.D. Cal. 2004) ("The enforcement of federal criminal statutes (as opposed to state, tribal or local

criminal statutes) on tribal lands has traditionally been the responsibility of the [BIA]. This

function was arguably performed without express statutory authority until 1990 when Congress

provided the BIA with express authority under [ILERA] to enforce federal law on Indian lands."

(citing 25 U.S.C. 2802(a))). OJS has broad responsibility for law enforcement in Indian country

under ILERA, including but not limited to "the enforcement of Federal law and, with the consent

of the Indian tribe, tribal law[,] . . . the investigation of offenses against criminal laws of the United

States, [and] the protection of life and property." 25 U.S.C. § 2802(c)(1)–(3). OJS is additionally

responsible for "the development and provision of law enforcement training and technical

assistance" under § 2802(c)(9), and under that authority, OJS has adopted a handbook with

minimum standards with which BIA law enforcement officers and programs must comply to receive federal funding.[37]

Twenty years after passage of ILERA, Congress enacted the Tribal Law and Order Act of 2010 to improve law enforcement in Indian country.  Pub. L. No. 111-211, Title II, 124 Stat. 2258 (codified at 25 U.S.C. §§ 2801–2815).  In the "Findings and Purposes" section of TLOA, Congress acknowledged that "the United States has distinct legal, treaty, and trust obligations to provide for the public safety of Indian country."  Id. § 202(a)(1).  Congress further acknowledged that "less than 3,000 tribal and Federal law enforcement officers patrol[led] more than 56,000,000 acres of Indian country, which reflect[ed] less than [half] of the law enforcement presence in comparable rural communities nationwide."  Id. § 202(a)(3).

Recognizing the public safety issues in Indian country, TLOA sought to clarify the responsibilities of federal, state, tribal, and local governments and improve coordination among law enforcement agencies through standardization of crime data collection and improved information sharing.  Id.  TLOA expanded the authority of certain tribal courts to sentence those within tribal court criminal jurisdiction to up to three years in custody and a $15,000 fine for each offense committed in Indian country, as long as the tribal court assures certain due process rights.[38]

---

[37] A recent edition of the OJS handbook, which totals more than 600 pages, is available online at Bureau Indian Affs., Off. Just. Servs., Law Enforcement Handbook (3d ed. 2015), https://www.bia.gov/sites/default/files/dup/BIA%20OJS%20Third%20Edition%20LE%20Handbook%202015%20_%20Approved%20Public%20Release%283%29.pdf.

[38] The Tribe is not among those TLOA-certified tribes and there are very few TLOA-certified tribes because the costs of assuring due process rights, such as court-appointed law trained counsel, is beyond most tribes' financial capability.  The Bill of Rights does not apply in tribal courts or tribal operations.  After all, tribes and tribal justice systems predate the Constitution's finalization in 1789 and the Bills of Right's adoption with ratification alongside the Constitution in 1791.  The Bill of Rights restricts federal government authority, and the extension of certain protections through the Fourteenth Amendment applies to states, not tribes.  Santa Clara Pueblo v. Martinez, 436 U.S. 49, 56 (1978).

United States v. Cavanaugh, 643 F.3d 592, 596 n.2 (8th Cir. 2011).  TLOA further directs OJS to submit an annual report to Congress on tribal public safety and justice programs containing, among other things, a "list of the unmet staffing needs of law enforcement" in Indian country.  25 U.S.C. § 2802(c)(16)(C).  That report[39] must also include the "formula, priority list or other methodology used to determine the method of disbursement of funds for the public safety and justice programs administered by [OJS]."  § 2802(c)(16)(D).

Federal law enforcement responsibility under ILERA and TLOA depends on the nature of criminal jurisdiction on a particular tribe's lands.  Criminal jurisdiction in Indian country depends on whether a tribe is subject to Public Law 280[40] and tribal members are subject to state jurisdiction or is an "Indian country" jurisdiction like the Reservation.  In every state, the federal government has jurisdiction over generally applicable federal offenses, such as federal drug and firearm offenses, no matter the locus of the offense or the identity of the persons involved.  See generally 18 U.S.C. Pt. I.  In so-called "Indian country" jurisdictions[41] like the Reservation where Public Law 280 does not extend state jurisdiction, criminal jurisdiction over crimes involving Indians (as either perpetrators or victims) is shared between the federal government (typically handling felony cases) and tribal governments, which have jurisdiction over "Indians" in both serious and misdemeanor cases.  See, e.g., 18 U.S.C. §§ 1152, 1153; see also Cohen, supra note 1, § 4.02[3][b]

---

[39] Several TLOA Reports to Congress were introduced as exhibits at the evidentiary hearing.  Hr'g Ex. 8–13.

[40] For Public Law 280 states, state courts rather than federal courts possess felony jurisdiction over offenses committed by or against anyone on tribal lands, whether the defendant is Indian or non-Indian.  Tribes in Public Law 280 states, if they have a tribal court, possess concurrent jurisdiction over all Indians and may exercise jurisdiction over non-Indians in rare circumstances, but the length of tribal sentences are limited.  Cohen, supra note 1, § 1.06.

[41] "Indian country" jurisdictions comprise a minority of the total number of tribes but encompass some of the largest reservations.  South Dakota is not a Public Law 280 state, so its nine reservations are all "Indian country" jurisdictions.

(discussing Supreme Court's holding in <u>Duro v. Reina</u>, 495 U.S. 676 (1990) and congressional repudiation of that decision with the so called "<u>Duro</u>-fix," which affirmed tribes' power to exercise criminal jurisdiction over all Indians including non-member Indians on their reservations). The states handle on-reservation crimes involving only non-Indians. In any event, when responding to emergency 911 calls, tribal police do not screen for jurisdiction, but seek to deal with the situation to promote public safety and quell the emergency. Tribal police have the authority to detain non-Indians on the reservation, even when they lack jurisdiction over them. <u>United States v. Cooley</u>, 141 S. Ct. 1638, 1641 (2021).

ILERA, TLOA, and the other criminal law enforcement statutes are generally applicable to tribes. The Tribe heavily relies on these statutes, the OJS law enforcement handbook, and congressional TLOA reports to support its assertion of the United States' law enforcement duty on the Reservation. <u>See, e.g.</u>, Doc. 24 ¶ 71. The federal statutes related to law enforcement and criminal jurisdiction in Indian country are instructive but not controlling of the duty as discussed more thoroughly below.

### B. Analysis of the Government's Duty Regarding Law Enforcement on the Reservation and Claims One and Two

Claim one seeks a declaratory judgment that Defendants have a duty to ensure competent and effective law enforcement on the Reservation and claim two alleges mismanagement of funds and seeks an accounting based on that same duty. Accordingly, this Court must determine Defendants' duty to rule on the motion to dismiss for failure to state a claim and to evaluate the likelihood of success on the merits of those claims. In sum, the express language of the 1868 Treaty—when read in conjunction with the 1825 Treaty, 1851 Treaty, federal appropriations acts funding tribal police, and the numerous federal statutes Congress has enacted involving federal law enforcement responsibility on the Reservation—imposes some duty on the United States to

provide law enforcement support on the Pine Ridge Indian Reservation. The contours of that duty is a more difficult question.

The 1825 Treaty committed the United States to provide "protection" and cooperate to some degree with the Tribe to prosecute those non-Indians engaged in criminal misconduct. The 1851 Treaty required the United States to protect the Tribe and its members from "depredations" by non-Indians. In the 1868 Treaty, the United States covenanted to "keep an office open at all times for the purpose of prompt and diligent inquiry" into "such matters of complaint by and against the Indians," to investigate "all cases of depredation on person or property," to prosecute those non-Indians and non-tribal member Indians subject to the authority of the United States who harm tribal members on tribal lands, and to cooperate in law enforcement generally. Congress recognized a duty under the 1868 Treaty through appropriations referencing the 1868 Treaty a decade later to fund tribal police for the Tribe. The Tribe through these treaties was conceding some autonomy, including a concession in the 1868 Treaty to allow tribal members to be prosecuted by the United States in some circumstances, as well as ceding or opening up tribal lands in part to roads, army forts, and agencies. *Both* Bad Men Clauses contemplate bringing "bad men" before courts of the United States; in other words, while the Bad Men Clauses require intergovernmental cooperation, they are "asymmetrical with respect to extradition," which further suggests the United States obligated itself to a duty of law enforcement support on the Reservation. A Bad Man is Hard to Find, supra note 27, at 2528. The treaties with the Great Plains tribes remain solemn commitments of the United States and indeed in the 1868 Treaty the United States wrote "its honor is hereby pledged to keep it." 1868 Treaty, supra note 25. The passage of time and previous disregard of such treaty provisions as those establishing the Great Sioux Reservation does not render the treaty meaningless. See generally McGirt v. Oklahoma, 140 S. Ct. 2452, 2462

(2020) (reasoning that courts cannot ignore express treaty promises "no matter how many other promises to a tribe the federal government has already broken").

The Indian law canons of construction allow certain inferences from the text in view of practical reality and support this Court's finding of a treaty-based duty.  See generally Rosebud Sioux Tribe, 9 F.4th at 1025 (recognizing that "some 'adjustment and accommodation' must occur to make a tribe whole when treaties are read decades later" (quoting Washington State Commercial Passenger Fishing Vessel Ass'n, 443 U.S. at 681)).  The "canons of construction applicable in Indian law are rooted in the unique trust relationship," and as such, "treaties should be construed liberally in favor of the Indians." Cnty. of Oneida, 470 U.S. at 247.  The canons also "require the court to construe the statutes cited in the complaint liberally in favor of the Tribe and to resolve any ambiguous provisions to the Tribe's benefit." Jewell, 205 F. Supp. 3d at 1062 (citing Blackfeet Tribe of Indians, 471 U.S. at 767).  The canons are themselves derived from the historical reality that treaties were largely imposed upon the tribes, and tribes often "had no choice but to consent." Choctaw Nation v. Oklahoma, 397 U.S. 620, 631 (1970).[42]

The chiefs executing the 1868 Treaty did so by signing with an "X" because they were not proficient in the English language and to them the document was written in a foreign language.

---

[42] While this is often true, the Lakota tribes were not a conquered people in 1825, 1851, or at the time of the 1868 Treaty.  The United States chose to make peace rather than continue war with the tribes.  The United States' concessions to the Great Plains tribes were by no means charity; the Great Sioux Reservation would not have been established in the heart of traditional Lakota homelands had the federal government not received something significant in return.  See Kimbra Cutlip, In 1868, Two Nations Made a Treaty, the U.S. Broke It and Plains Indian Tribes are Still Seeking Justice, Smithsonian Mag. (Nov. 7, 2018), https://www.smithsonianmag.com/smithsonian-institution/1868-two-nations-made-treaty-us-broke-it-and-plains-indian-tribes-are-still-seeking-justice-180970741/ (noting that 1868 Treaty was a high point for Sioux tribal power in the region); see also Frank Pommershiem, The Reservation as Place: A South Dakota Essay, 34 S.D. L. Rev. 246, 253 (1989) (noting United States was in a virtual military standoff with the Lakota).

Rosebud Sioux Tribe, 9 F.4th at 1020.  As Oman notes, "[I]t appears that in large measure the Indians did not learn the full content of the Fort Laramie Treaty until . . . 1870; had they understood that the government expected them to take up a life of farming near the agencies along the Missouri River, they might never have consented."  Oman, supra, at 47.  Nor could the Tribes have fully realized that aggressive western expansion by non-Indians was really just beginning, or that by the year 2023, years of federal policy over Indian affairs waffling from hostile to helpful to neglectful would result in tremendous losses of tribal land, diminished tribal sovereignty, and a public safety crisis on the Reservation.  Pommershiem, supra note 42, at 252–58 (discussing evolution of federal Indian policy through the nineteenth and twentieth centuries).  Of course, courts may not rely on the Indian canons of construction to disregard clear expressions of tribal and congressional intent, even if with the benefit of hindsight, those intentions may have been ill-advised.  DeCoteau v. Dist. Cnty. Ct. for Tenth Jud. Dist., 420 U.S. 425, 447 (1975).  This Court need not disregard clear expressions of tribal and congressional intent to find a treaty-based duty here, however, because the duty here is primarily derived from the treaty text read in historical context.

Textually, the First Bad Men Clause of the 1868 Treaty as interpreted in Ex Parte Crow Dog contemplates the United States being responsible only for law enforcement investigation and prosecution of non-tribal member crimes victimizing tribal members.  The Second Bad Men Clause then makes the United States responsible for prosecuting those tribe-member Indians surrendered by the Tribe who victimize non-tribal members.  But Article 5 of the 1868 Treaty, the conduct of the United States in the decades since the 1868 Treaty was signed, and the practical reality of law enforcement in Indian country today, make clear that the federal government's law enforcement responsibility on the Reservation is a bit broader.  For starters, Article 5 envisions the United States keeping an office open "at all times for the prompt and diligent inquiry" into

complaints *by and against* the Indians and requires investigation into *all cases* of depredation on person or property.  Moreover, neither the appropriations acts funding an "Indian police" force on the Reservation for decades after the 1868 Treaty, nor the Snyder Act, ILERA, or TLOA, meaningfully differentiate between crimes committed by Indians and those committed by non-Indians in their repeated affirmations that the United States bears significant responsibility for public safety in Indian country.  In fact, ILERA is very clear that OJS has *broad* responsibility for law enforcement in Indian country.  See 25 U.S.C. § 2802(c) (listing OJS responsibilities, including charging it with the "protection of life and property" in Indian country).  Tribal law enforcement on the Reservation respond to 911-calls and law enforcement requests that come from anywhere within the Reservation and from Indians and non-Indians alike.  The Tribe's 638 contract requires it to respond 24/7 to those calls, and obviously the Tribe does not and cannot verify whether an emergency involves tribal members or non-tribal members before responding.  See Doc. 3 ¶ 11.

Thus, while the United States did not have sole responsibility for policing on the Reservation under the text of the 1868 Treaty, the federal government cannot possibly fulfill its treaty duty "to keep an office open at all times for the purposes of prompt and diligent inquiry into such matters of complaint by and against the Indians as may be presented for investigation," even if that is only understood to involve primarily non-tribal members, without providing some law enforcement support on the Reservation in general.  That support must have some degree of competence, as "it is difficult to imagine a set of circumstances in which the Tribe would have agreed to the Government's delivery of 'incompetent'" law enforcement support.  See Rosebud Sioux Tribe, 9 F.4th at 1025.  But the Tribe has taken over those law enforcement services under

a 638 contract, so it bears the responsibility for hiring and retaining competent officers.[43]   In any event, law enforcement support from the United States must be consistent with the federal government's repeated promises to the Tribe in the 1825 Treaty, 1851 Treaty, and 1868 Treaty that they would be received under the "protection" of the United States and have their tribal members protected by the United States.   The plain language of the 1868 Treaty, viewed in historical context and given a fair appraisal, provides the substantive source of the United States' law enforcement duty on the Reservation.

As in Rosebud Sioux Tribe, the Tribe here does not solely rely on general "Indian trust law doctrine but instead on interpretation and construction of the Treat[ies], the trust relationship between the Government and the Tribe, and the statutory scheme underlying the alleged duty[.]" 9 F.4th at 1023.   Any declaratory judgment that can be entered would be less concrete than what the Tribe seeks, because these treaties and subsequent statutes do not direct a particular level of funding.   But as the Eighth Circuit noted in Rosebud Sioux Tribe, "[t]he Declaratory Judgment Act permits the judiciary to 'declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.'" Id. at 1025 (quoting 28 U.S.C. § 2201(a)).

On one hand, this Court must determine whether the amended complaint alleges facts to support a cause of action under the Declaratory Judgment Act, which requires there be a "substantial controversy" presenting a "concrete and specific question."   Id.   Given that the Defendants owe the Tribe a treaty-based duty related to law enforcement, this Court concludes

---

[43] Those involved in tribal law enforcement who testified during the February hearing were certainly competent and nothing in this decision should be read as questioning tribal police's competence.   Of course, the Tribe can only do so much with the funding it is provided to fulfill its responsibility under its 638 contract to hire and retain competent officers.

that claim one of the amended complaint alleges sufficient facts at this stage to state a claim that Defendants have violated that duty; that is, taking the facts alleged in the amended complaint as true, the Tribe has alleged a substantial controversy that presents a concrete and specific question—whether the Defendants have violated their treaty-based law enforcement duty to the Tribe meriting entry of declaratory relief.  Because the Tribe seeks a preliminary injunction making it necessary to evaluate likelihood of success on the merits, this Court must answer the duty question more definitively at this stage than it would if it were ruling on a motion to dismiss standing alone.  Contra Rosebud Sioux Tribe v. United States, No. 3:16-CV-03038-RAL, 2017 WL 1214418, at *9 (D.S.D. Mar. 31, 2017) (stating only that allegations in complaint regarding breach of trust were sufficient to survive a motion to dismiss, without explicitly defining the duty as a matter of law); Rosebud Sioux Tribe, 450 F. Supp. 3d at 1001 (holding on cross motions for summary judgment that "[t]he United States does owe the Tribe some duty to provide health care to its members, even if the fiduciary duty judicially enforceable is just physician-led health care based on the construction of the 1868 Treaty of Fort Laramie").

The United States has a duty of protection, cooperation, and support of the Tribe's law enforcement, but as discussed, at this stage the Tribe is unlikely to succeed on the merits of requiring funding at its requested level.  Taken together, the 1825 Treaty, 1851 Treaty, and 1868 Treaty, federal appropriations for tribal law enforcement dating back to just after the 1868 Treaty was signed, subsequent statutes, and the general trust law duty indicate that the United States may neither abandon altogether funding and support of the Tribe's law enforcement, nor act arbitrarily and capriciously, or otherwise in disregard of that duty.  However, the treaty-based duty is not "to provide for and ensure competent and effective law enforcement" as the Tribe contends and certainly does not entitle the Tribe to funding at whatever level it requests.  This Court can render

a declaration of what duty the United States has, but it is unlikely that the Tribe will succeed on the merits on its claim that the duty alone restrains Defendants from their current calculations of service population or justifies funding Tribal law enforcement at the particular level identified by the Tribe. But because the Tribe also seeks other interim relief as explained below, the scope of the duty is broad enough for this Court to foresee some likelihood of success on the Tribe's claims, albeit more limited than the Tribe seeks. In short, claim one is not dismissed, but likewise does not justify the sort of preliminary injunction the Tribe requests.

In the Defendants' view, "neither the 1825, 1851, and 1868 Treaties, nor any of the statutes that Plaintiff identifies, impose a specific treaty duty to provide law enforcement personnel or funding at the Tribe's preferred level." Doc. 35 at 41. There indeed is no specific treaty duty to fund law enforcement personnel at the "Tribe's preferred level," but the United States certainly owes some duty related to law enforcement to the Tribe as a signatory to the 1825 Treaty, 1851 Treaty, and 1868 Treaty. Defendants argue that none of the appropriations acts funding Indian police on the Reservation were in fulfillment of a treaty obligation to provide law enforcement on the Reservation. Doc. 35 at 51. In other words, Defendants view the federal dollars Congress appropriated over the many decades as merely gratuitous, rather than in fulfillment of any specific treaty obligation. See Doc. 35 at 53. The 1878 Act's references to the 1868 Treaty and continual funding for Indian police undermines Defendants' arguments and contextualizes the likely intent of the parties regarding law enforcement responsibility on the Reservation. Although the United States' treaty-based law enforcement duty on the Reservation is not as broad as the Tribe urges, as this Court has explained, the duty is not nonexistent either as Defendants assert.

A similar result applies to claim two alleging mismanagement of funds under the treaty and trust responsibility and seeking an accounting regarding the Defendants' use of funds allocated

by Congress from 1998 to the present.  The parties actively debate the extent to which the Tribe's current law enforcement funding remains based on the 1999 TPA amount, which vastly underrepresented actual law enforcement spending because of the funding of roughly half of tribal officers through CIRCLE and COPS grants.  Defendants assert that their formula for allocating "new funds" has increased the Tribe's base funding amount many times over the years but concede that allocations to the Tribe are primarily based on historical funding amounts.  Doc. 35 at 23.  The Tribe counters that Defendants are not transparent with their "formula" used to calculate increases from past funding levels and that one of Defendants' factors is service area population, which (according to the Tribe) Defendants grossly underestimate for the Reservation.

This Court is reluctant to issue a preliminary injunction to disrupt Defendants' current funding methodology, however cryptic and unfairly derived it may be given its use of a distorted historical basis and service population that may under count those on the Reservation.  Federal courts are ill-suited to chaperone federal agencies in their funding formulas for allocating monies among qualified recipients; federal courts are neither Article I policymaking or funding bodies nor Article II executives carrying out policies and administering funding.  The Supreme Court, however, has long recognized that federal courts *do* have a role in preventing the other branches of government and states from breaching trust responsibilities or ignoring treaty obligations.  See generally Worcester v. Georgia, 31 U.S. 515, 519 (1832) (noting, as part of the Marshall Trilogy, that treaties with Indian nations, which "had always been considered as distinct, independent political communities," are the supreme law of the land).  As the Supreme Court recently wrote concerning arguments akin to those Defendants make here:

> [M]any of the arguments before us today follow a sadly familiar pattern.  Yes, promises were made, but the price of keeping them has become too great, so now we should just cast a blind eye.  We reject that thinking.  If Congress wishes to withdraw its promises, it must say so.

McGirt, 140 S. Ct. at 2482; see also Washington State Com. Passenger Fishing Vessel Ass'n, 443 U.S. at 675 ("A treaty, including one between the United States and an Indian tribe, is essentially a contract between two sovereign nations."); Jewell, 205 F. Supp. 3d at 1060 n.5 ("And it is well understood that treaties between Indian tribes and the government, which set out the rights and obligations of each party, are meant to be enforced.").

This Court contemplates allowing discovery and deciding later whether permanent injunctive relief should enter to require Defendants to recalculate the tribal law enforcement funding to the Tribe. The Tribe has made an initial showing that the Defendants' "formula," or perhaps more accurately "methodology," is not transparent. The Tribe has further shown that methodology has some connection to the Tribe's 1999 TPA base which was an artificially low, unreliable level of actual law enforcement cost and need on the Reservation, and that Defendants' service population calculation for the Reservation may be substantially too low. But the likelihood of success on the merits is debatable given that the United States' treaty-based duty discussed above does not specify funding calculations or formulas.

The public interest favors allowing discovery and better development of information before a federal court makes any ruling potentially disruptive of an agency's funding methodology, especially considering both the existence of some federal funding to provide some level of law enforcement on the Reservation and the harm to Defendants in disrupting a system used for allocating funds among many tribes (although the signatories to the treaties at issue have a special relationship beyond the general trust relationship owed to other tribes). No doubt, the public interest also favors funding appropriate law enforcement on the Reservation to address as soon as possible what appears to be a public safety crisis and holding the United States to its treaty obligations. But the duty the United States owes to the Tribe does not readily lend itself to

determining what factors should be weighed and how to determine what level of additional funding to the Tribe is sufficient or required during the pendency of this case. Whether and how this Court should and does navigate those issues depends on development of a better record and understanding of how Defendants have calculated funds for the Tribe's 638 contracts for law enforcement.

Defendants argued in briefing that the Tribe abandoned its claim that the United States has a trust duty to provide an accounting. Doc. 55 at 22. The Tribe made clear at the preliminary injunction hearing that it has not abandoned its claim for an accounting, and there is no reason to deem the Tribe to have waived claim two. The Tribe's second claim survives Defendants' motion to dismiss.

### C. Claims Three through Six

In claims three through six of the amended complaint, the Tribe invokes the Indian Self-Determination and Education Assistance Act (ISDEAA). Typically, ISDEAA does not support a claim for a particular level of funding, absent a separate and unique trust duty, so Defendants move to dismiss these claims. Under ISDEAA, tribes can enter into contracts— commonly referred to by their original public law number as "638 contracts"—with the United States to run programs previously administered directly by the government. See 25 U.S.C. § 5321(a)(1)(E) (authorizing self-determination contracts to administer programs "for the benefit of Indians because of their status as Indians"); 25 U.S.C. § 2802(d)(4)(i) (permitting tribes to take over BIA law enforcement responsibilities through 638 contracts). The Tribe for decades has entered into 638 contracts to run its own law enforcement services. To enter or amend an existing 638 contract, tribes first must submit a proposal to the applicable executive agency (in this case, the Secretary of the Interior) for review. 25 U.S.C. § 5321(a)(2). Upon receiving a tribe's proposal, the Secretary is directed to

approve the proposal and award the contract to the tribe within 90 days unless certain conditions apply. 25 U.S.C. § 5321(a)(2).

Tribal 638 contract proposals are to be denied only in limited circumstances; ISDEAA makes clear that "[i]n the negotiation of contracts and funding agreements, the Secretary shall at all times negotiate in good faith to maximize implementation of the self-determination policy; and carry out this chapter in a manner that maximizes the policy of Tribal self-determination[.]" 25 U.S.C. § 5321(f) (cleaned up). To deny a proposal, the Secretary must provide "written notification to the applicant that contains a specific finding that clearly demonstrates that, or that is supported by a controlling legal authority" that at least one of the following conditions apply:

> (A) the service to be rendered to the Indian beneficiaries of the particular program or function to be contracted will not be satisfactory;
>
> (B) adequate protection of trust resources is not assured;
>
> (C) the proposed project or function to be contracted for cannot be properly completed or maintained by the proposed contract;
>
> (D) the amount of funds proposed under the contract is in excess of the applicable funding level for the contract, as determined under section 5325(a) of this title; or
>
> (E) the program, function, service, or activity (or portion thereof) that is the subject of the proposal is beyond the scope of programs, functions, services, or activities covered under paragraph (1) because the proposal includes activities that cannot lawfully be carried out by the contractor.

25 U.S.C. § 5321(a)(2)(A)–(E). When declining to enter a 638 contract, the Secretary must state any objections in writing to the tribal organization, provide assistance to the tribe to overcome the stated objections, and provide the tribe with a hearing and an opportunity to file an administrative appeal; alternatively, a tribe can challenge the denial in federal district court. 25 U.S.C. § 5321(b).

ISDEAA further encourages 638 contracts by requiring the Secretary to sever and approve those portions of a proposal that are allowable by law even when some parts of the proposal cannot

be approved.  25 U.S.C. § 5321(a)(4).  If a tribe challenges the declination of a 638 contract proposal in federal district court, "the Secretary shall have the burden of proof to establish by clearly demonstrating the validity of the grounds for declining the contract proposal (or portion thereof)."  25 U.S.C. § 5321(e)(1); see also Lower Brule Sioux Tribe v. Haaland, No. 3:21-CV-03018-RAL, 2022 WL 4131194, at *1 (D.S.D. Sept. 12, 2022) (discussing how the Contract Disputes Act and ISDEAA give a federal district court subject matter jurisdiction over a claim brought by a tribe against the federal government arising from a self-determination contract).[44]

ISDEAA limits how certain 638 contract terms may be negotiated or renegotiated.  25 U.S.C. § 5324.  For example, a 638 contract generally cannot last for a term of longer than three years, unless the Secretary and a tribe agree otherwise, or the contract has been in place and continuously operated by a tribe for three or more years already.  25 U.S.C. § 5324(c)(1); see also 25 U.S.C. § 5304(h) (listing 638 contracts that may have a term of longer than three years).

Importantly, regarding contract funding, ISDEAA states that "[t]he amount of funds provided under the terms of self-determination contracts entered into pursuant to this chapter shall not be less than the appropriate Secretary would have otherwise provided for the operation of the programs or portions thereof for the period covered by the contract."  25 U.S.C. § 5325(a)(1).  In other words, tribes are not to be given short shrift on federal funding just because they operate a program under a 638 contract instead of the federal agency providing that service directly.  Tribes

---

[44] The parties dispute whether this Court should conduct a de novo review of whether the Secretary satisfied the burden of proof for declining the Tribe's proposal or whether the "arbitrary and capricious standard" of the Administrative Procedure Act should apply instead.  See Doc. 35 at 60 n.22; Doc. 43 at 42–43.  "The majority of district courts have concluded that ISDEAA's text, its legislative history, and the general presumption favoring Indian tribes dictates a de novo review of ISDEAA claims."  Navajo Health Found.-Sage Mem'l Hosp., Inc. v. Burwell, 220 F. Supp. 3d 1190, 1224 (D.N.M. 2016) (compiling cases); see also Cheyenne River Sioux Tribe v. Kempthorne, 496 F. Supp. 2d 1059, 1066–67 (D.S.D. 2007) (accepting de novo review as the proper standard for judicial review of administrative decisions taken under the ISDEAA).

also receive funding for "contract support costs"—that is, "costs a tribal organization must incur to comply with its self-determination contracts, but which are not considered part of the direct operation of the program." Cohen, supra note 1, § 22.02[5]; see also 25 U.S.C. § 5325(a)(2) ("There shall be added to the amount . . . support costs which shall consist of an amount for the reasonable costs for activities which must be carried on by a tribal organization as a contractor to ensure compliance with the terms of the contract and prudent management . . . .").

Funding for 638 contracts is constrained by 25 U.S.C. § 5325(b).  The Secretary may increase funding for a 638 contract at the request of a tribe, but again, "the provision of funds under [the ISDEAA] is subject to the availability of appropriations[.]"  25 U.S.C. § 5325 (b). Critically, "the Secretary *is not required to reduce funding for programs, projects, or activities serving a tribe to make funds available to another tribe* or tribal organization under this chapter." 25 U.S.C. § 5325(b) (emphasis added).  ISDEAA further provides that "[t]he amounts of [638] contracts shall be subject to the availability of appropriations . . . [and] may be renegotiated annually to reflect changed circumstances and factors, including, but not limited to, cost increases beyond the control of the tribal organization."  25 U.S.C. § 5324(c)(1)–(2).

The Tribe's ISDEAA claims rely heavily on the requirement in 25 U.S.C. § 5325(a)(1) that "the amount of funds provided under . . . [a 638 contract] shall not be less than the . . . Secretary would have otherwise provided for the operation of the programs" had the federal government operated the program directly.  The Tribe's argument goes like this: If the Tribe had not taken over law enforcement on the Reservation through its 638 contracts with BIA, the United States logically would be required under its treaty-based duty to provide competent and effective law enforcement support on the Reservation.  Under § 5325(a)(1) of ISDEAA, the Tribe notes, the federal government in contracting with the Tribe to operate law enforcement must provide no less funding

to the Tribe than it would have spent on Reservation law enforcement had the Tribe not entered

the 638 contract.  Logically then, the Tribe reasons, the government must provide the Tribe funds

to support competent and effective law enforcement through its 638 contracts and thereby satisfy

the federal treaty duty for law enforcement support on the Reservation.  This argument has logical

appeal, but the fact that the Tribe has run its own law enforcement for decades makes it difficult

to forecast or infer on this record what the government would now spend if it were to take over

law enforcement on the Reservation.

Claims three through six of the amended complaint invoke ISDEAA in various ways.  In

its third claim, the Tribe contends that the March 2022 partial declination letters failed to include

a statutorily sufficient explanation for why BIA declined to provide the Tribe with the full funding

it sought through its two 638 contract proposals.  Doc. 24 ¶¶ 158–64.  The Tribe alleges that the

Defendants failed to provide a specific finding demonstrating that its proposals could be properly

declined, either partially or fully, under one of the four conditions outlined in § 5321(a)(2).  The

Tribe's fourth and sixth claims focus more specifically on BIA's declination of its proposal to

operate the school resource officer, drug enforcement, missing persons, and internal affairs

programs.  Doc. 24 ¶¶ 165–71, 190, 199–208.  The Tribe believes that BIA's explanation that those

programs are "central office functions" is insufficient because the proposals sought only to contract

for a local fraction of the money BIA directs at those programs.  Doc. 24 ¶¶ 192–93.  The Tribe's

fifth claim alleges that the Defendants failed to meet their "burden of proof . . . 'by clearly

demonstrating the validity of the grounds for declining'" the law enforcement and criminal

investigations proposals.  Doc. 24 ¶ 173.

The Tribe's amended complaint alleges sufficient facts for claims three and five to survive

the Defendants' motion to dismiss.  Indeed, those likely are cognizable claims under ISDEAA

69

even absent a separate treaty-based duty.  The alleged public safety shortfalls on the Reservation combined with the treaty-based duty owed to the Tribe state a plausible claim that the Defendants are failing to provide the Tribe with the amount of funding that the federal government would otherwise spend to fulfill its law enforcement treaty duty on the Reservation were those responsibilities not contracted to the Tribe under ISDEAA.  Not to mention that the budgetary alternatives and technical assistance Defendants assert they have provided fall well short of what would address the public safety crisis on the Reservation.  This Court has greater skepticism about whether claims four and six are viable but must rule on the motion to dismiss based on the allegations of the amended complaint and not based on what it has learned during the preliminary injunction hearing and thus allows those claims to survive the motion to dismiss.

Defendants' arguments in support of their motion to dismiss the Tribe's ISDEAA claims are unconvincing and better addressed after discovery on a motion for summary judgment.  The Defendants assert that approval of the Tribe's contract proposals were clearly foreclosed by 25 U.S.C. § 5321(a)(2)(D), which permits BIA to decline a 638 contract proposal if "the amount of funds proposed under the contract [are] in excess of the applicable funding level for the contract." But § 5321(a)(2)(D) further provides that the "applicable funding level" for the contract is determined by reference to § 5325(a), which again, entitles the Tribe to no less funding than the Secretary would have otherwise provided had the federal government retained control over the program.

While Defendants cite to <u>Los Coyotes Band of Cahuilla & Cupeño Indians v. Jewell</u>, 729 F.3d 1025 (9th Cir. 2013), to justify their use of historical funding amounts and other factors to set law enforcement funding for the Tribe, <u>Los Coyotes</u> is distinguishable.  For starters, <u>Los Coyotes</u> dealt with a tribe's request for a 638 contract regarding law enforcement in a Public Law 280 state,

where at the time BIA spent nothing on tribal law enforcement services statewide.  Id. at 1034.

The Ninth Circuit concluded that ISDEAA "limits the amount of money that a tribe may obtain

under a 638 contract to the amount that the *BIA is currently spending on the program in existence*

for which the tribe seeks to obtain a contract to operate"; because BIA was previously spending

nothing on tribal law enforcement in California, the agency was not required to accept the tribe's

638 proposal.  Id. at 1033 (emphasis added).  Los Coyotes did not mention the tribe being entitled

to law enforcement support under a specific treaty duty and presumably it was not.  The court in

Los Coyotes reasoned that the tribe was entitled to no more law enforcement funding than BIA

was previously allocating to the tribe, while acknowledging that 25 U.S.C. § 5325(a)(1) does not

actually state the words "currently allocating."  Id. at 1036.  The court concluded nonetheless "that

the phrase the statute does include—'would have otherwise provided'—leads to the same result."

Id.  Unlike in Los Coyotes, the Oglala Sioux Tribe is not located in a Public Law 280 state, has

had federal funding of law enforcement dating back to the late-nineteenth century, presently

receives funds under a 638 contract for law enforcement, and is party to treaties obligating

protection and law enforcement cooperation and support.  The Tribe is not taking a position, as

did the tribe in Los Coyotes, that § 5325(a)(1) should be read in a way that "would . . . lead to the

illogical result that the Secretary must fund every contract request, for any amount."  Id.

Congress appears to have given the Tribe a mechanism through ISDEAA by which to

enforce a treaty-based duty, and this Court cannot ignore the law's commands simply because

doing so may prompt difficult budgeting decisions for the Defendants.  And that Congress has

chosen to underfund law enforcement in Indian country does not thereby justify dismissal of

ISDEAA claims or absolution from treaty-based duties.  See Salazar v. Ramah Navajo Chapter,

567 U.S. 182, 200 (2012) (noting that ISDEAA requirements may prove difficult to manage when

71

Congress appropriates insufficient funds, but that "dilemma's resolution is the responsibility of Congress").

Nor is this Court persuaded that the Defendants are excused from fulfilling their treaty obligations to the Tribe because in their view doing so would necessarily come at the expense of other tribes.[45]   The Defendants insist that "if the agency does not have sufficient funds to simultaneously award a proposed contract and maintain services for a non-contracting tribe, it can properly decline the proposal." Doc. 35 at 62.  Even assuming this were a correct reading of the law, whether the amount BIA must spend on law enforcement on the Reservation to fulfill its treaty-based obligations would necessarily come at the expense of other tribes is a fact question not properly resolved on a motion to dismiss.  After all, not all of the monies appropriated to BIA OJS are turned over to tribes under 638 contracts or expended for BIA police on those reservations where "Indian country" law enforcement is not under a 638 contract; in other words, some OJS monies are not spent on reservations.   Moreover, Defendants' arguments about ISDEAA's provisions making funding "subject to the availability of appropriations" have been rejected in other contexts.  See Salazar, 567 U.S. at 190 ("When a Government contractor is one of several persons to be paid out of a larger appropriation sufficient in itself to pay the contractor, it has long

---

[45] Of the approximately 574 federally recognized tribes, only a few were party to the 1825 Treaty, 1851 Treaty, and 1868 Treaty.  And there are only a handful of other treaties that contain language akin to the 1868 Treaty.  See A Bad Man is Hard to Find, supra note 27, at 2525–27; Richard, 677 F.3d at 1150 n.16 (noting there are nine treaties made in 1868 that contain Bad Men Clauses or similar language, all of which were duly ratified, proclaimed, and published).  This decision is unlikely to open a Pandora's box of numerous tribes suing Defendants asserting entitlement to more appropriate law enforcement funding under 638 contracts.  Just because there are at least eight other treaties that contain identical or largely similar Bad Men Clauses does not mean that each of those treaties creates a duty identical to the one found here.  In defining a treaty-based duty, historical context is a large part of the analysis.  The treaties not discussed by this opinion and order were concluded at different times and by different tribes, and courts construing those treaties could come to a different conclusion than that reached here.

been the rule that the Government is responsible to the contractor for the full amount due under the contract, even if the agency exhausts the appropriation in service of other permissible ends."); Cherokee Nation of Oklahoma v. Leavitt, 543 U.S. 631, 642 (2005) ("We recognize that agencies may sometimes find that they must spend unrestricted appropriated funds to satisfy needs they believe more important than fulfilling a contractual obligation. But the law normally expects the Government to avoid such situations . . . .").

Like in Rosebud Sioux Tribe, the Defendants' "reliance on the lump-sum appropriations to absolve it of any duty is also undercut by the Supreme Court's ruling in Quick Bear." Rosebud Sioux Tribe, 450 F. Supp. 3d at 1001 (citing Reuben Quick Bear v. Leupp, 210 U.S. 50 (1908)). That is, because the Defendants have not identified a specific appropriation which annually funds law enforcement support as promised in the 1868 Treaty, at least a portion of the funds allocated to BIA through the more general appropriation bill must be in fulfillment of the federal government's treaty obligation to the Tribe, even if the bulk of those same funds are merely "gratuitous" appropriations for tribes without treaty provisions relating to Indian law enforcement. Id. The money allocated to law enforcement on the Reservation, at least in some measure, is in the performance of a treaty-based obligation.

The Tribe's ISDEAA claims three through six of the amended complaint survive the motion to dismiss. However, the Tribe has not shown a likelihood of success on the merits sufficient to justify a preliminary injunction to restrain Defendants' use of a historical base amount in its allocations, to direct a different service population (on which there remains a dispute of fact), or to fund the Tribe's law enforcement at the level the Tribe requested in its proposals.

### D. APA Claim

The Tribe's seventh and final claim challenges BIA's partial declinations of the law enforcement and criminal investigation proposals under the APA. The Defendants move to

dismiss this claim on the grounds that BIA allocations for law enforcement funding on the Reservation are committed to agency discretion and thus immune from suit under 5 U.S.C. § 701(a)(2).

Defendants cite to <u>Lincoln v. Vigil</u>, 508 U.S. at 193, arguing again that Congress provides BIA with law enforcement funding in Indian country through a lump sum appropriation, with no statutory guidance on how the money is to be allocated. The Supreme Court in <u>Lincoln</u> noted however that "an agency is not free simply to disregard statutory responsibilities: Congress may always circumscribe agency discretion to allocate resources by putting restrictions in the operative statutes." <u>Id.</u> at 193. BIA does not have unfettered discretion in this case because Congress *has* circumscribed agency discretion over how law enforcement funds for 638 contracts are to be allocated: they must provide the Tribe what the Secretary otherwise would have spent had the agency run the law enforcement program itself. And what the agency is required to spend for law enforcement on the Reservation must at least be sufficient to fulfill its specific treaty-based duties to the Tribe. The Supreme Court rejected in <u>Lincoln</u> that the agency's discretion was limited by the special trust relationship existing between Indian people and the federal government. <u>Id.</u> at 194–95. But here, the Tribe is not relying only on special trust relations generally existing between the government and Indian people, but instead invokes a treaty-based duty to provide law enforcement support on the Reservation. The Tribe's APA claim thus survives the motion to dismiss.

### IV.    Motion for Preliminary Injunction

To justify the granting of a preliminary injunction, the Tribe has the burden on what is known in the Eighth Circuit as the four <u>Dataphase</u> factors: likelihood of success on the merits, the threat of irreparable harm to the movant, the balance of the equities between the parties, and whether an injunction is in the public interest. This Court concludes that the Tribe is entitled only

to limited relief at this stage and not to the sort of preliminary injunction sought in its motion. For the reasons this Court has explained, the United States has a treaty-based duty to provide protection to the Tribe, as well as support and cooperation in tribal law enforcement, but whether the Tribe will succeed on the merits on its claim that the duty restrains Defendants from their current base funding and service population calculations is debatable, and the duty does not in itself justify funding Tribal law enforcement at the particular level sought by the Tribe. The scope of the duty is broad enough for this Court to foresee some success on the part of the Tribe as this opinion and order has outlined in its analysis of a treaty-based duty, but not so broad that the Tribe is entitled to the preliminary injunctive relief that it seeks. After all, the Tribe asks this Court to take the extraordinary step, on quite a limited record, of ordering the federal government to recalculate how it allocates limited funding for law enforcement to the Tribe, which in turn arguably could impact the calculation for various other tribes at least in the short term.

To be sure, the United States owes a law enforcement duty to the Tribe, and given the evidence presented about the public safety crisis on the Reservation, it is possible that Defendants' decision to base the Tribe's 638 contract funding on the Tribe's 1999 TPA law enforcement budget does not satisfy that duty and that Defendants' service population calculation on the Reservation is arbitrarily low. But the Tribe has not offered a viable alternative for calculating federal law enforcement funding on the Reservation at this point, short of simply giving the Tribe what it requested. This Court is unconvinced for instance that the Tribe's baseline for what it believes it needs in terms of federal law enforcement resources—2.8 officers for every 1000 people—is actually what BIA would otherwise have spent if it were to provide policing services directly under ISDEAA, let alone required to fulfill a treaty-based duty. This does not mean that BIA's

calculation of the funding is proper or sufficient to discharge its treaty-based duty; that is for later decision based on a more developed record.

On the second Dataphase factor, the Tribe has shown a threat of irreparable harm through evidence that its police are overwhelmed, not responding to 911 calls in a timely manner or sometimes at all, and unable to provide the level of policing a community deserves. Underfunded and overwhelmed law enforcement poses a threat to the welfare of people on the Reservation and likely is connected to rising murders, violent crime, and gun and drug crimes.

The third Dataphase factor of balance of harm is difficult to weigh. The Tribe and Reservation residents and visitors face a clear and present harm from an overwhelmed police force unable to cover all the emergency calls for service on the Reservation. If the requested injunction entered, Defendants might need to adopt two formulas—one for tribes without a specific treaty-based right and a second for the Tribe and perhaps other tribes who were parties to the 1868 Treaty or other treaties with similar language. But the treaty-based duty is not one that readily lends itself to integration into a funding formula, so what different criteria BIA OJS ought to use remains too illusive for this Court to ascertain at this time and apply on a preliminary injunction motion. And Defendants note that Congress has consistently chosen to underfund law enforcement on reservations generally notwithstanding the annual TLOA reports, leaving them in a position where increased funds to the Tribe means decreased funds elsewhere, whether to other tribes or BIA's internal operations.

The threat of harm to the Tribe from not granting relief now is offset by the harm to Defendants from this Court interjecting its own underinformed best guess as to the proper historical base, actual service population, or proper funding level; such determinations are extremely difficult for a court to make, especially on a preliminary injunction request with a limited

record.  The public interest favors proper funding of tribal law enforcement but through a more studied approach.

The final <u>Dataphase</u> factor considers the public interest.  The public interest is served by having a properly trained, funded, staffed, and equipped police force, particularly in areas such as the Reservation that are afflicted with high rates of violent crime.  The public interest also favors rational and transparent BIA OJS funding of law enforcement on the Reservation.  The United States upholding its treaty obligations to the Tribe and to tribes generally advances the public interest as well and may serve in some small part to help rectify historical wrongs.  On the other hand, individual federal courts dictating agency funding allocations for law enforcement without a fully developed record disserves the public interest.  On balance, the public interest favors some relief here, however modest.

For now, this Court finds that the Tribe is not entitled to its first and second requests for preliminary injunctive relief.  But the Defendants must, as soon as practicable, provide the Tribe with technical assistance so the Tribe may revise its law enforcement and criminal investigations contract proposals with funding requests that reflect, considering this opinion and order, what amount is necessary to satisfy the United States' treaty-based duty to the Tribe concerning protection and law enforcement support and cooperation.  Defendants also should reassess its population estimate for the Tribe's service area and underfunding stemming from use of the 1999 TPA as a historical base.  The parties are encouraged to work together promptly to figure out how to more fairly fund tribal law enforcement.

## V.    Conclusion

For the reasons set forth in this Opinion and Order, it is now

ORDERED that Defendants' Motion to Dismiss Plaintiff's Amended Complaint, Doc. 33, is denied.  It is further

ORDERED that Plaintiff's Motion for an Expedited Preliminary Injunction, Doc. 25, is granted in part and denied in part.  The preliminary injunction is granted to the limited extent that this Court determines that the United States has a duty of protection, cooperation, and support of the Tribe's law enforcement, and the Defendants may neither abandon altogether funding and support of the Tribe's law enforcement, nor act arbitrarily and capriciously, or otherwise in disregard of that duty.  Defendants should revaluate the Tribe's requested funding including the service population data and provide technical assistance to the Tribe to refine its funding requests.

DATED this 23rd day of May, 2023.

BY THE COURT:

ROBERTO A. LANGE
CHIEF JUDGE