UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | |
|---|---|
| OGLALA SIOUX TRIBE, A FEDERALLY RECOGNIZED INDIAN TRIBE;<br><br>Plaintiff,<br><br>vs.<br><br>UNITED STATES OF AMERICA, DEB HAALAND, IN HER OFFICIAL CAPACITY AS SECRETARY OF THE UNITED STATES DEPARTMENT OF INTERIOR; UNITED STATES BUREAU OF INDIAN AFFAIRS, JOHN BURGE, IN HIS OFFICIAL CAPACITY AS SPECIAL AGENT IN CHARGE OF DISTRICT 1 OF THE UNITED STATES OFFICE OF JUSTICE SERVICES OF THE UNITED STATES DEPARTMENT OF THE INTERIOR; TINO LOPEZ, IN HIS OFFICIAL CAPACITY AS ACTING APPROVING OFFICIAL FOR THE OFFICE OF JUSTICE SERVICES OF THE UNITED STATES DEPARTMENT OF THE INTERIOR; DARRYL LACOUNTE, IN HIS OFFICIAL CAPACITY AS COMMISSIONER, BUREAU OF INDIAN AFFAIRS, UNITED STATES DEPARTMENT OF THE INTERIOR; GINA DOUVILLE, IN HER OFFICIAL CAPACITY AS SUPERINTENDENT OF INDIAN AFFAIRS OF THE UNITED STATES BUREAU OF INDIAN AFFAIRS OF THE UNITED STATES DEPARTMENT OF THE INTERIOR; AND GLEN MELVILLE, IN HIS OFFICIAL CAPACITY AS DIRECTOR, OFFICE OF JUSTICE SERVICES OF THE UNITED STATES DEPARTMENT OF THE INTERIOR, BUREAU OF INDIAN AFFAIRS;<br><br>Defendants. | 5:22-CV-05066-RAL<br><br>ORDER ON PENDING MOTIONS |

1

This Court previously issued an Opinion and Order Denying Defendant's Motion to Dismiss and Ruling on Plaintiff's Motion for Preliminary Injunction ("opinion and order"). Doc. 78. After an extensive consideration of applicable treaties and statutes, see Doc. 78 at 1-77, this Court granted Plaintiff's Motion for an Expedited Preliminary Injunction only "to the limited extent that this Court determines that the United States has a duty of protection, cooperation, and support of the [Oglala Sioux] Tribe's law enforcement, and the Defendants may neither abandon altogether funding and support of the Tribe's law enforcement, nor act arbitrarily and capriciously, or otherwise in disregard of that duty." Doc. 78 at 78. This Court added that "Defendants should reevaluate the Tribe's requested funding including the service population data and provide technical assistance to the Tribe to refine its funding requests." Doc. 78 at 65-73, 78.

After this Court's opinion and order, the Tribe and the Defendants exchanged written communication and then held seven meetings by video conference between August 30 and November 8, 2023. The parties—through declarations, exhibits, recordings and some transcripts of the conferences—characterize the discussions between them very differently and excerpt different parts of this Court's previous ruling to justify their respective positions. The Tribe filed Plaintiff's Motion to Compel Compliance with Preliminary Injunction or, in the Alternative for an Order to Show Cause for Civil Contempt. Doc. 87. The Tribe reads this Court's prior opinion to require three things of the Defendants: 1) "technical assistance so the Tribe may revise its law enforcement and criminal investigations contract proposals with funding requests that reflect, considering this opinion and order, what amount is necessary to satisfy" the duty of the United States; 2) "reassess its population estimate for the Tribe's service area;" and 3) reassess the

2

"underfunding stemming from use of the 1999 TPA as a historical base." Doc. 89 at 22.[1] The Tribe asserts that Defendants did none of these three things, though they did institute a national change to use tribal enrollments to assess population estimates for tribal service areas and offered technical assistance on matters collateral to the central funding issues. The Tribe says that the change in population estimates resulted in no additional law enforcement funding for the Tribe. Doc. 89 at 22. The Tribe notes that Defendants refused to alter the "Secretarial amount" based on the outdated 1999 formula and provided no material assistance to the Tribe in revising its funding requests. Doc. 89 at 15-22. The Tribe notes that Defendants have had large carryforwards and denied the Tribe's request for $850,000 from those. Doc. 89 at 18-19. The Tribe wants Defendants to be sanctioned or to show cause why they should not be held in contempt. Doc. 89 at 26-27.

Defendants oppose the motion and claim to have reevaluated the Tribe's funding request, to have updated the service population base and to have offered and continued to offer technical assistance. Doc. 104 at 12-14. Defendants quote excerpts of this Court's opinion and order and then boldly assert that they have "determined that they exceed the trust obligations identified in [this Court's] Preliminary Injunction Order" through what they are already funding and doing. Doc. 104 at 15. Defendants suggest that the Tribe's core assumption about outdated 1999 numbers driving the underfunding is mistaken, Doc. 104 at 19-20, and that Defendants did provide a one-time carryforward amount of $112,662 to the Tribe, Doc. 104 at 21. Defendants argue that the Tribe has not sustained its burden to show contempt by clear and convincing evidence and this Court's injunction was not clear enough to support a contempt finding. Doc. 104 at 11-12. Defendants also argue against having an evidentiary hearing on the motion. Doc. 104 at 35-37.

---

[1] Both the Tribe and Defendants filed briefs with cover pages and indices, so the page cited here in CM/ECF matches the page number on the CM/ECF header but not the page number at the bottom of the brief.

3

Further, Defendants imply in briefing that this Court should reconsider the determination of a duty in light of the decision Arizona v. Navajo Nation, 599 U.S. 555 (2023), rendered after this Court's opinion and order. Doc. 104 at 29-35; see id. at 33 n.10.

The Tribe's reply brief, among other things, draws from the preliminary expert report of Troy A. Eid, a former U.S. Attorney for the District of Colorado and former Chairman of the Indian Law and Order Commission, who refutes Defendants' position that they have exceeded the trust obligation and duties explicated in this Court's prior opinion and order. Doc. 111 at 14-16. The Tribe also cited to a Declaration of the former Deputy Director of BIA's Office of Justice Services (OJS), Charles Addington, to counter Defendants' arguments about, among other things, the base underfunding in 1999. Doc. 111 at 10, 12-13, 17-19.

Defendants then filed a Motion in Limine to Strike the Declarations of Troy Eid and Charles Addington and to Preclude Their Testimony. Doc. 118. Defendants argue that Eid's opinions are not admissible under Rule 702 of the Federal Rules of Evidence, that he is not qualified to opine on Defendants' duty or the Tribe's staffing, that he lacks reliable methodology, and that his testimony is irrelevant. Doc. 118 at 12-20. Defendants urge this Court to disallow Addington's testimony because as a former OJS employee, he cannot attest to matters within the agency's deliberative process in Defendant's formulating its budget and his testimony allegedly would violate 18 U.S.C. § 207, particularly 18 U.S.C. § 207(j)(6)(A) which debars former government employees "except pursuant to court order, [to] serve as an expert witness for any other person (except the United States) in that matter." Doc. 118 at 20-27. In the alternative, Defendants ask leave to depose Eid and Addington before this Court conducts any evidentiary hearing at which they might testify. Doc. 118 at 27-29.

4

The Tribe opposes the motion in limine to strike the Eid and Addington declarations and wishes to rely on their testimony about whether Defendants have in fact complied with what this Court ordered and to counter what the Defendants assert. The Tribe argues that Eid is well qualified to testify on the subjects disclosed, Doc. 124 at 6-14, and that Addington has given requisite notice to the Government and is not testifying to things implicating the deliberative process or violating 18 U.S.C. § 207, Doc. 124 at 14-27. The Tribe also opposes leave to depose those experts prior to a hearing on the motion to compel or for sanctions. Doc. 124 at 28. Defendants disagree. Doc. 126.

After consultation with counsel, this Court set a status hearing for Friday, October 4, 2024, and admittedly, has been slow and frustrated in an effort to find time to digest the information filed. The parties likely would welcome some ruling from this Court to provide guidance on what they should expect on October 4, 2024.

For starters, this Court does not read Navajo Nation to justify reconsideration or alteration in any way of this Court's prior opinion and order. The majority in Navajo Nation neither overturned nor limited any of the cases on which this Court relied. This Court's historical and textual analysis of the applicable treaties and statutes was at least as extensive as what the majority in Navajo Nation did. Compare Doc. 78 at 1-78, with Navajo Nation, 599 U.S. at 558-70. The Navajo Nation found itself arguing that the United States must "take affirmative steps to secure water for the Navajos," id. at 558, based on 1868 treaty language assuring them a "permanent home" and "seed and agricultural implements," quite a far cry from the treaty provisions this Court relied upon to find "some duty on the United States to provide law enforcement support on the Pine Ridge Reservation," Doc. 78 at 55, and the history of congressional enactments that followed, id. at 20-64.

5

Rather <u>Navajo Nation</u> supports this Court's cautious approach to formulating the duty owed. This Court determined:

> The United States has a duty of protection, cooperation, and support of the Tribe's law enforcement, but as discussed, at this stage the Tribe is unlikely to succeed on the merits of requiring funding at its requested level. Taken together, the 1825 Treaty, 1851 Treaty, and 1868 Treaty, federal appropriations for tribal law enforcement dating back to just after the 1868 Treaty was signed, subsequent statutes, and the general trust law duty indicate that the United States may neither abandon altogether funding and support of the Tribe's law enforcement, nor act arbitrarily and capriciously, or otherwise in disregard of that duty. However, the treaty-based duty is not "to provide for and ensure competent and effective law enforcement" as the Tribe contends and certainly does not entitle the Tribe to funding at whatever level it requests.

Doc. 78 at 61. And this Court recognized that "[a]ny declaratory judgment that can be entered would be less concrete than what the Tribe seeks, because these treaties and subsequent statutes do not direct a particular level of funding." <u>Id.</u> at 60. Nothing in <u>Navajo Nation</u> undermines the analysis in the opinion and order, and this Court did not mandate "affirmative steps" from the United States that are disconnected from treaty or statutory language.

The Supreme Court decision postdating this Court's opinion and order that might prove more impactful is <u>Loper Bright Enters. v. Raimondo</u>, 144 S. Ct. 2244. The majority in <u>Loper Bright</u> overruled <u>Chevron U.S.A. Inc. v. Nat. Res. Def. Council, Inc.</u>, 467 U.S. 837 (1984), thereby discarding a 40-year history under the <u>Chevron</u> doctrine of giving deference to federal agencies in interpreting statutes they administer and instead vesting with federal courts the authority to resolve ambiguities in such statutes without deference to how agencies more familiar with the subject matter have done. The parties have not briefed whether the decision in <u>Loper Bright</u> affects this case, but the drift away from deference to agency discretion in recent Supreme Court jurisprudence weighs on this Court's thinking.

Next, Defendant's motion in limine to strike declarations and debar testimony of Eid and Addington implicates Rule 702 of the Federal Rules of Evidence and, regarding Addington, Rule 701 and 18 U.S.C. § 207. Rule 702 permits a "witness who is qualified as an expert by knowledge, skill, experience, training, or education" to give opinions in testimony if it is more likely than not that: (a) the expert's ... other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." Rule 702 is a rule of inclusion, so long as the standards within the rule are met. Sappington v. Skyjack, Inc., 512 F.3d 440, 448 (8th Cir. 2008); Lauzon v. Senco Prods., Inc., 270 F.3d 681, 686 (8th Cir. 2001). In Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993) and again in Kumho Tire Co. V. Carmichael, 526 U.S. 137 (1999), the Supreme Court instructed the district court on its gatekeeper function to exclude unreliable or unhelpful expert testimony. This gatekeeper function is particularly important to determine what expert testimony to allow a jury to hear and at times requires a "Daubert hearing" prior to admission of the testimony. But for a court trial, such as here, "the district court may allow challenged expert testimony to be presented and then later determine issues of admissibility and reliability." Johnson & Johnson Vision Care, Inc. v. CIBA Vision Corp., 616 F.Supp.2d 1250, 1256 (M.D. Fla. 2009); see Williams v. Illinois, 567 U.S. 50, 69 (2012) (presumption that judge sitting as trier of fact will not rely on inadmissible evidence for improper purpose).

The issues at hand are for resolution by the Court and not a jury, and it appears "more likely than not" that Eid and Addington's testimony could aid this Court's understanding of the issues and derive from their specialized knowledge with a basis on facts and reliable application of

7

principles to those facts. Neither Eid nor Addington will be allowed to contradict what this Court has decided is the law and the Defendants will get free rein to cross examine them on their data and methodology used to arrive at any opinions.

Defendants challenge Addington's declaration as containing portions that contravene 18 U.S.C. § 207, an anti-corruption law. Section 207 in relevant part prohibits former federal employees who "knowingly make[], with the intent to influence" a communication with or appearance in a court proceeding in which the United States has a direct and substantial interest or is a party if the former federal employee "participated personally and substantially" in the matter. Addington is a former OJS official, and as such gave notice to the Department of Interior of his subsequent employment with the Tribe as Coordinator of the Tribe's Department of Public Safety. Under the ISDEAA,

> [A] former officer or employee of the United states who is carrying out official duties as an employee . . . of a tribal organization . . . may act as an agent . . . for, and appear on behalf of, such tribal organization . . . in connection with any matter related to a tribal government activity or Federal Indian program or service pending before any department, agency, court, or commission, including any matter in which the United States is a party.

25 U.S.C. § 5323(j)(2). Nevertheless, Defendants assert that part of what Addington placed in his declaration discloses privileged government deliberation and contravenes Section 207. This Court is skeptical of those arguments, as those paragraphs of the Addington declaration relate to matters either in the public realm or not involving the pre-decisional deliberative process the privilege is meant to protect. See Hinckley v. United States, 140 F.3d 277, 284 (D.C. Cir. 1998). As for the Section 207 issue concerning Addington, this Court trusts that the parties and Addington will steer clear of questioning Addington or having him testify in a way that contravenes Section 207.

What remains then is the Tribe's Motion to Compel Compliance with Preliminary Injunction, or in the Alternative, for an Order to Show Cause for Civil Contempt, Doc. 87. Federal

courts have the "inherent power to enforce compliance with their lawful orders through civil contempt." Shillitani v. United States, 384 U.S. 364, 370 (1966). Civil contempt serves two purposes: "to effectuate compliance with a court's order or process; and to compensate individuals from harm incurred by noncompliance." Hartman v. Lyng, 884 F.2d 1103, 1106 (8th Cir. 1989). "[A] compensatory sanction is not imposed to vindicate the court's authority or to punish the contemnor, but rather serves to make reparation to the injured party, restoring that party to the position it would have held had the court's order been obeyed." Hartman, 884 F.2d at 1106 (citation omitted). "Because the contempt power is a substantial one, it should be used sparingly and not be lightly invoked." Id.

"[C]ontempt orders must be based upon a party's failure to comply with a clear and specific underlying order." Int'l Bhd. of Elec. Workers, Local Union No. 545 v. Hope Elec. Corp., 293 F.3d 409, 418 (8th Cir. 2002). In determining whether an order is clear and specific, courts apply "an objective standard that takes into account both the language of the order and the objective circumstances surrounding the issuance of the order." United States v. Young, 107 F.3d 903, 907 (D.C. Cir. 1997); see also Chaganti & Assocs., P.C. v. Nowotny, 470 F.3d 1215, 1224 (8th Cir. 2006) (finding order to execute certain documents was clear and specific despite failing to identify the specific documents because the pleadings and discussions at a hearing made it clear which documents the order referenced). Moreover, "a party to an action is not permitted to maintain a studied ignorance of the terms of a decree in order to postpone compliance and preclude a finding of contempt." Chaganti & Assocs., P.C., 470 F.3d at 1224 n.2 (cleaned up and citation omitted). In the event an underlying order is vague, the parties have "an obligation to seek clarification of the court's order." Id. "[S]ubstantial, good faith compliance is a defense to an action for civil contempt." Wycoff v. Hedgepeth, 34 F.3d 614, 616 (8th Cir. 1994).

9

"A party seeking civil contempt bears the initial burden of proving, by clear and convincing evidence, that the alleged contemnors violated a court order." Chi. Truck Drivers v. Bhd. Lab. Leasing, 207 F.3d 500, 505 (8th Cir. 2000). Once a showing is made, the burden shifts to the alleged violators to show an inability to comply. See id.

Whether to enter an order to compel compliance depends on what the underlying order requires. What is at the core of this lawsuit is what relief this Court can fashion, if any, to address chronic underfunding of law enforcement on the Oglala Sioux Indian Reservation. But this Court did not require any particular level of funding of the Tribe's law enforcement and instead wrote: "Any declaratory judgment that can be entered would be less concrete than what the Tribe seeks, because these treaties and subsequent statutes do not direct a particular level of funding." Doc. 78 at 60. This Court added: "Federal courts are ill-suited to chaperone federal agencies in their funding formulas for allocating monies among qualified recipients." Doc. 78 at 63. Plainly this Court cannot sanction Defendants or compel them to fund the Tribe at any particular level or with any particular amount of carryforward funds.

Yet this Court continued and analyzed the Defendants' responsibilities under 25 U.S.C. § 5325(a)(1) to fund the Tribe's 638 contract for law enforcement at the same level that the Government would spend to provide that service directly, subject to available appropriations. Doc. 78 at 67. This Court acknowledged that "it is possible that Defendants' decision to base the Tribe's 638 contract funding on the Tribe's 1999 TPA law enforcement budget does not satisfy that duty and that the Defendants' service population calculation on the Reservation is arbitrarily low." Doc. 78 at 75. To provide the parties with a view of how the case should proceed, this Court wrote:

> This Court contemplates allowing discovery and deciding later whether permanent injunctive relief should enter to require Defendants to recalculate the tribal law enforcement funding to the Tribe. The Tribe has made an initial showing that the Defendants' "formula," or perhaps more accurately "methodology," is not

10

> transparent. The Tribe has further shown that methodology has some connection to the Tribe's 1999 TPA base which was an artificially low, unreliable level of actual law enforcement cost and need on the Reservation, and that Defendants' service population calculation for the Reservation may be substantially too low.

Doc. 78 at 64. The parties should not expect this Court to tackle this core question of whether the Defendants' use of a 1999 TPA base is actionable—one characterized as "for later decision based on a more developed record"—on anything less than a full record after trial. See Doc. 78 at 76.

But there was more to the opinion and order that might be addressed preliminarily, such as that "the Defendants must as soon as practicable, provide the Tribe with technical assistance so the Tribe may revise its law enforcement and criminal investigations contract proposals with funding requests" consistent with the opinion and order. Doc. 78 at 77. This duty stems from the ISDEAA and ILERA, which this Court discussed previously. Doc. 78 at 65-73; see 25 U.S.C. § 2802(c)(9), (13), (17). The ISDEAA allows for a federal cause of action, 25 U.S.C. 5321(b), but there seems to be sparse authority on what equitable or injunctive relief, such as contempt sanctions, special master appointment, or other means of compelling Governmental compliance with the ISDEAA, if this Court were to find some violation of the ISDEAA or ILERA or treaty-based duties occurred stemming from the communications and then meetings between the parties from August to November of 2023 in the wake of the opinion and order. Defendants provided some technical assistance and revised population estimates, but the Tribe views these efforts as falling short of what the opinion and order required. This Court is disinclined to impose sanctions or find Defendants in contempt on the paper record alone.

Quite a bit of time has elapsed since the Tribe's motion was filed, leaving this Court interested in hearing what discussions or meetings have occurred between the parties in the interim and perhaps what additional technical assistance was sought or provided. It remains true that "[t]he parties are encouraged to work together promptly to figure out how to more fairly fund tribal law

enforcement." Doc. 78 at 77. If this Court is going to take some action to compel compliance with the prior ruling or require a showing of cause to avoid contempt, it wants to consider any post-motion activity Defendants have undertaken to discharge what duties they owe as outlined in the prior opinion and order.

This Court hopes that this Order on Pending Motions assists the parties somewhat in preparing for the October 4 status hearing. This Court contemplates a discussion on when the parties will be ready for a trial of the merits, though if the parties want to present testimony and exhibits before trial or at the hearing, this Court may entertain that. This Court also wants to hear from the parties on whether to allow Defendants to depose Eid and Addington. Regardless of how this Court rules, the Tribe and the Defendants have an ongoing relationship, which ought to be more cooperative than contentious. Hopefully, this order allows counsel for the parties to discuss the best utilization of court time for the hearing on October 4 and how best to bring this case to a conclusion. Therefore, it is

ORDERED that Defendants' Motion in Limine to Strike the Declarations of Troy Eid and Charles Addington and to Preclude Their Testimony, Doc. 118, is denied. It is further

ORDERED that Plaintiff's Motion to Compel Compliance with Preliminary Injunction or, in the Alternative, for an Order to Show Cause for Civil Contempt, Doc. 87, is granted only to the limited extent that this Court will consider argument and testimony if the parties wish on what, if any, injunctive or other equitable relief might be appropriate in an interim order, which can be addressed at the October 4 hearing or thereafter, and otherwise denied as this Court wants to save ruling on the core issues in this case until after trial.

DATED this 30th day of September, 2024.

BY THE COURT:

_____
ROBERTO A. LANGE
CHIEF JUDGE

13